# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD ERIC ROSS,<br><br>                              Petitioner,<br><br>v.<br><br>SCOTT KERNAN, Secretary,<br>                              Respondent. | Case No.:  17cv0953-JAH (RBB)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: DENYING PETITION FOR WRIT OF HABEAS CORPUS [ECF NO. 1]** |

Richard Eric Ross, a state prisoner proceeding by and through counsel, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 with an attached Memorandum of Law [ECF No. 1].  He challenges his San Diego County Superior Court conviction on thirteen counts of sex crimes against two young girls, for which he is serving a sentence of 120 years to life plus 17 years in state prison.  (Pet. 1, ECF No. 1.) The Petition presents a single claim, that Ross received ineffective assistance of counsel due to the failure of his trial counsel to present testimony from a child abuse pediatric expert that the girls should have undergone physical examinations which would have easily proved or disproved their allegations.  (Pet. Mem. 5-7, ECF No. 1 Attach. #2.)

On August 21, 2017, the Attorney General for the State of California responded by filing an Answer on behalf of Scott Kernan, the Secretary of the California Department of Corrections and Rehabilitation [ECF No. 7], with an attached Memorandum of Points and

Authorities [ECF No. 7 Attach. #1], and a Notice of Lodgment [ECF No. 8]. Petitioner filed a Traverse on September 5, 2017 [ECF No. 9], with a Notice of Lodgment [ECF No. 9 Attach. #1], and exhibits [ECF No. 9 Attachs. #2-4]. He filed a Supplemental Notice of Lodgment on September 13, 2017 [ECF No. 11]. Respondent filed a Supplemental Notice of Lodgment on September 20, 2017 [ECF No. 12].

For the reasons set forth herein, the Court finds that the state court adjudication of Petitioner's claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The Court **RECOMMENDS** the Petition be **DENIED**.

## I. PROCEDURAL BACKGROUND

On October 25, 2012, the San Diego County District Attorney's Office filed an eighteen-count amended information charging Richard Eric Ross with sexual penetration of Hannah C., a child ten years old or younger, in violation of California Penal Code ("Penal Code") § 288.7(b) (count one); committing a forcible lewd act upon Hannah in violation of Penal Code § 288(b)(1) (count two); and committing a lewd act upon Hannah in violation of Penal Code § 288(a) (count three). (Lodgment No. 1, Clerk's Tr. vol. 1, 0078-85, Oct. 25, 2012, ECF No. 8 Attach. #1 (amended information).) Petitioner was also charged with four counts of oral copulation of Breanna L., a child ten years of age or younger, in violation of Penal Code § 288.7(b) (counts four, five, seven, and fourteen); six counts of committing a lewd act upon Breanna in violation of Penal Code § 288(a) (counts six, nine, eleven, thirteen, sixteen and eighteen); two counts of sexual intercourse with Breanna in violation of Penal Code § 288.7(a) (counts eight and seventeen); and three counts of sexual penetration of Breanna in violation of Penal Code § 288.7(b) (counts ten, twelve and fifteen). (Id.) As to counts two, three, six, nine, eleven, thirteen, sixteen, and eighteen, it was alleged the offenses were committed against more than one victim within the meaning of Penal Code § 667.61(b)(c)(e), and that substantial sexual conduct occurred within the meaning of Penal Code § 1203.066(a)(8). (Id.)

On April 4, 2014, a jury found Petitioner not guilty on count one but guilty of the lesser included offense of attempted sexual penetration, not guilty on counts eight, nine, seventeen, and eighteen, and guilty on the remaining counts. (Lodgment No. 1, Clerk's Tr. vol. 2, 0443-63, Apr. 4, 2012, ECF No. 8 Attach. #2 (verdicts).) The jury found that substantial sexual conduct occurred with Hannah as to two counts, substantial sexual conduct occurred with Breanna as to four counts, and an offense was committed against more than one victim as to two counts. (Id. at 0445-46, 0449, 0455, 0457, 0460.) The jury returned not true findings that substantial sexual contact occurred as to one count or that an offense was committed against more than one victim as to four counts. (Id. at 0445, 0449, 0455, 0460.)

On August 7, 2014, Ross filed a motion for a new trial alleging he received ineffective assistance of counsel because his trial attorney failed to present exculpatory evidence and failed to allow him to testify on his own behalf. (Id. at 0306-22.) The new trial motion was denied on September 26, 2014, following an evidentiary hearing at which Ross and his trial counsel testified. (Id. at 0466.) He was immediately thereafter sentenced to 120 years to life plus 17 years in state prison. (Id. at 0467-68.)

Petitioner appealed, presenting the same claims he raised in the new trial motion. (Lodgment No. 3, Appellant's Opening Brief, People v. Ross, No. D066786 (Cal. Ct. App. [filed June 23, 2015]), ECF No. 8 Attach. #7; see also Lodgment No. 4, Respondent's Brief, People v. Ross, No. D066786 (Cal. Ct. App. [filed Aug. 13, 2015]), ECF No. 8 Attach #8; Lodgment No. 5, Appellant's Reply Brief, People v. Ross, No. D066786 (Cal. Ct. App. [filed Sept. 3, 2015]), ECF No. 8 Attach. #9.) On January 15, 2015, the appellate court affirmed in all respects. (Lodgment No. 8, People v. Ross, No. D066786, slip op. (Cal. Ct. App. Jan. 15, 2016), ECF No. 8 Attach. #12.) On February 22, 2016, Ross filed a petition for review in the California Supreme Court raising the same claims. (Lodgment No. 10, Petition for Review, People v. Ross, No. [S232585] (Cal. [filed Feb. 22, 2016]), ECF No. 8 Attach. #14.) The petition was summarily denied.

/ / /

(Lodgment No. 11, <u>People v. Ross</u>, No. S232585, order (Cal. Mar. 30, 2016), ECF No. 8 Attach. #15.)

On October 27, 2015, parallel with his direct appeal, Ross filed a habeas petition in the state appellate court raising the same claim presented here. (Lodgment No. 6, <u>In re Ross</u>, No. [D069126] (Cal. Ct. App. [filed Oct. 27, 2015]) (petition for writ of habeas corpus), ECF No. 8 Attach. #10.) The People filed an informal response on December 3, 2015. (Lodgment No. 7, <u>In re Ross</u>, No. D069126 (Cal. Ct. App. [filed Dec. 3, 2015]) (informal response), ECF No. 8 Attach. #11.) Ross's reply brief was rejected as untimely. (<u>See</u> Pet. Mem. 34, ECF No. 1 Attach. #2.) On January 15, 2015, the appellate court denied habeas relief. (Lodgment No. 9, <u>In re Ross</u>, No. D069126, slip op. (Cal. Ct. App. Jan. 15, 2016), ECF No. 8 Attach. #13.) Ross filed a habeas petition in the California Supreme Court on February 26, 2016, which raised the claim presented here. (Lodgment No. 12, <u>In re Ross</u>, No. [S232822] (Cal. [filed Feb. 26, 2016]) (petition for writ of habeas corpus), ECF No. 12 Attach. #1.) The petition was summarily denied. (Lodgment No. 13, <u>In re Ross</u>, No. S232822, order (Cal. May 18, 2016), ECF No. 12 Attach. #2.)

## II. FACTUAL BACKGROUND

Tami R. testified that she was married to Allan L. from 1996 to 2007, and they had one child, Breanna L., born on June 12, 2004. (Lodgment No. 2, Rep.'s Appeal Tr. vol. 2, 45-46, Mar. 27, 2014, ECF No. 8 Attach. #4.) After their marriage ended in 2007, Tami moved from Oregon to San Diego, while Breanna stayed in Oregon with Allan pending custody arrangements. (<u>Id.</u> at 47-48.) Allan moved to San Diego in May 2008, where Breanna spent equal amounts of time with Allan and Tami. (<u>Id.</u> at 50.) In January 2009, while living in San Diego, Tami began a relationship with a mutual friend of hers and Allan's, Richard Eric Ross, who they called Eric. (<u>Id.</u> at 48-49.) Tami, Ross, and Breanna lived together in the UTC area of La Jolla where Breanna attended kindergarten and first grade. (<u>Id.</u> at 49, 55.) In 2009 or 2010, Allan married Melissa L., whose

/ / /

daughter Hannah was within a year of Breanna's age, and the two girls came to consider each other sisters.  (Id. at 51-52.)

Tami and Ross moved to Poway in May 2011, where Hannah and Breanna attended the same school.  (Id. at 53-54, 57.)  Ross occasionally took the girls to school, picked Breanna up after school, and stayed with her alone in the house until Tami returned home from work.  (Id. at 57-58.)  During the course of Tami's sexual relationship with Ross, the two of them used a pink plastic dildo she purchased before their relationship began, a silver bullet dildo he purchased before their relationship began, as well as a clear lubricant, all of which they kept in a drawer in a bedroom nightstand.  (Id. at 58-61.)  One day in early 2012, Ross called Tami at work and said he found the silver bullet dildo on in the nightstand, thought it might be a fire hazard, and wanted her to know he had thrown it away.  (Id. at 61.)  She did not see it in the house again after that day.  (Id. at 76-77.)

On May 21, 2012, Hannah, Allan and Melissa's daughter, was dropped off at Tami's house before Tami went to work.  (Id. at 68-69.)  As Tami was arriving at work, Ross called and said Hannah tried to run away as he was taking the girls to school, and he tore his Achilles tendon chasing her.  (Id. at 68.)  Several police cars were in front of her house when Tami came home.  (Id. at 72.)  Allan told Tami he had asked Hannah if Ross had touched her inappropriately, and Hannah said "yes."  (Id. at 93-94.)  Tami then asked Breanna if what Allan told Tami was true, and Breanna said "yes."  (Id. at 73.)  Hannah and Breanna went to Allan and Melissa's house while Tami took Ross to the hospital. (Id.)  Tami said Child Protective Services visited her home on June 1, 2012, in order to ensure it was a safe environment for Breanna.  (Id. at 74.)  Ross temporarily moved out a few days before the visit and took with him anything she thought might reflect negatively, including the sex toys and lubricant in the nightstand, alcohol, guns, and ammunition.  (Id. at 74-75, 90-91.)

Tami said she met Ross, a real estate agent, in 2001, while she was still married to Allan, when he helped them sell their condominium, and they met again when Tami and

Ross were in a wedding party in July 2007. (Id. at 76-78, 83, 91.) At that wedding, on just one occasion, Tami, Ross, and Allan had a sexual encounter together. (Id. at 83-84.) Tami and Allan separated a couple of months later, and she began dating Ross in October 2007. (Id. at 83.) Tami described Allan and Ross as cordial acquaintances who did not socialize with each other. (Id. at 84-85.)

Breanna L. testified that she would turn ten years old on June 12, 2014, and her stepsister Hannah is eleven years old. (Id. at 96-97, 99.) They attend the same school, where Breanna is in fourth grade and Hannah in fifth. (Id. at 100.) Breanna said Ross, who she calls Eric, has lived with her and her mother since she was little, and she could remember them having lived together in three different houses. (Id. at 100-02.) Every other week Breanna stayed at Hannah's house with Melissa and Allan. (Id. at 108.)

Breanna said that when they lived in the second house, when Tami was at work and she was alone with Ross, while she was unclothed, he used his mouth twice (counts four and five) and his hand once (count six) to touch her "private part" located under her stomach where her pee comes out. (Id. at 103-07.) When she was asked if he touched the inside or the outside of her private part, she said, "I think it was only the outside, maybe." (Id. at 105.) When asked similar questions, she answered "I'm pretty sure the outside," and "I think on the outside." (Id. at 110-11.) They were living in the third house when the police came. (Id. at 107.) In the living room of the third house, Ross touched the outside of her unclothed private part with his mouth (count seven) and his hand (count thirteen); and in the bedroom of that house, he touched her private part with his mouth (count fourteen) and hand (count sixteen). (Id. at 110-12.) She said as far as she knew he never touched his penis to her private part.[1] (Id. at 118.)

/ / /

---

[1] The only counts involving Breanna of which Ross was acquitted were counts eight and seventeen, alleging sexual intercourse with a child ten years old or younger, and the lesser included offenses of attempted sexual intercourse, and counts nine and eighteen, each charging him with a lewd act upon a child. (Lodgment No. 1, Clerk's Tr. vol. 2, 0451-53, 0461-63, ECF No. 8 Attach. #2.)

17cv0953-JAH (RBB)

Breanna asked him to stop touching her, but Ross just said, "It's okay" and "don't tell anybody." (Id. at 109.) On more than one occasion, Ross put "a little buzzy toy" that ran on batteries on the inside (count ten) and outside (count eleven) of her private part. (Id. at 112-15.) At some point, Breanna told Ross she did not want him to use it anymore and he said he would throw it away, but did not, and then said she could throw it away, which she did. (Id. at 113.) On one occasion when they were both unclothed, Ross put a liquid from a small bottle that looked like water on her private part, and then "peed on me, in my private part, the one below the stomach." (Id. at 117-19.) He also touched her legs and her "other private part that's above the stomach" with his mouth "more than once, but not very often." (Id. at 119-20.) She denied ever looking into the drawers of the bedside nightstand. (Id. at 148.)

Breanna said that on the morning the police came to her house, Hannah and she were in Ross and Tami's bed watching television with Hannah under the covers and Breanna on top of the covers. (Id. at 121-22.) Ross came in and laid on the bed, with Hannah between them. (Id. at 122-23.) Ross got under the covers, and Breanna said she was "pretty sure he started touching Hannah," although Breanna could not see what was happening, and then Hannah ran to the bathroom looking scared. (Id. at 124.) Breanna asked Ross if they could have a snack, and he gave snacks to Breanna who passed one to Hannah through the bathroom door. (Id. at 125.) Hannah told Breanna that Ross had touched her, and said "I'm scared, and I'm freaking out." (Id. at 125-26.)

Hannah told Breanna she was going to walk or run to school, and then left the house with Ross running after her. (Id. at 126-27.) Ross hurt his foot running after Hannah, and they both came back to the house. (Id. at 127-28.) Hannah was crying and called Allan or Melissa, and Breanna overheard their conversation. (Id. at 128-29.) Ross told Hannah not to say what happened, but Hannah told Melissa or Allan "what went on." (Id.) Allan and Melissa came to the house first, followed by Breanna's aunt, then the police, and then Tami. (Id. at 130.) Breanna said she never told Hannah that Ross had also touched her "[b]ecause Eric told me to not tell anybody, and I was too scared to."

(Id. at 126.) She was scared "[b]ecause I thought he was going to get me in trouble because he looked like a really strong guy."[2] (Id.)

Hannah C. testified that she turned eleven years old on February 17, 2014, and is in fifth grade. (Id. at 168-69.) She lives with her mother Melissa and stepfather Allan, and her sister Breanna stays with them every other week. (Id. at 170-71.) Allan would usually drop her off at school, but on days he had to go to work early, he dropped her off at Breanna's house and Tami would take her and Breanna to school. (Id. at 173.) If Tami also had to go to work early, Ross would take them to school. (Id.) On the day the police came to Breanna's house, Hannah was dropped off there that morning by Melissa. (Id. at 173-74.) As soon as she walked in the house, Ross asked her for a hug, which was unusual, but she hugged him. (Id. at 174-75.) Hannah sat on the couch eating cereal while Ross was at his computer, and Ross asked for another hug. (Id. at 175-76.) She got up, hugged him, and "he told me that I was growing up or something or becoming a woman." (Id. at 176.) He then touched her, over her clothes, on her vagina (count three), which she called her "bikini area," on the part of her chest her mother calls "boobs," and on her butt. (Id. at 177-79.) She "just froze" and felt "violated." (Id. at 179.) She told Ross she thought she heard Breanna wake up and went upstairs. (Id.) As she walked up the stairs she saw what Ross was watching on his computer, a woman and a man in a library "doing stuff on the counter of the library." (Id. at 180-81.) Tami was upstairs in the bathroom doing her hair, and Hannah joined Breanna in her room. (Id. at 180.) She and Breanna wanted to jump on an air mattress after Tami left, but Ross said it would break, so he allowed them to jump on his bed. (Id. at 182.)

Hannah testified that when she and Breanna were in Ross and Tami's bed, Breanna asked Ross to play a game called "find us" - where the girls would hide under the covers and he would try to pull them out by their feet. (Id.) Hannah said Ross pulled her out by

---

[2] Ross is described in the probation officer's report as six feet two inches tall weighing 260 pounds. (Lodgment No. 1, Clerk's Tr. vol. 2, 0368, ECF No. 8 Attach. #2.)

her waist rather than her feet, pulling her pants down a little, which she thought was an accident. (Id. at 183, 201.) After the game, they all laid on the bed under the covers watching television, with Breanna on Hannah's right side and Ross on Hannah's left side. (Id. at 183-84, 202.) Ross tried to take Hannah's pants off and pulled them down to her knees. (Id. at 186.) Ross then touched her bikini area with his hand under her clothes (counts one and two), and prevented her from closing her legs. (Id. at 186-88.) She said he touched the inside of her bikini area, but also said "I don't really know how to describe it. He just touched me there." (Id. at 187.) She was scared and tried to pull her pants up but he would not let her. (Id.) Hannah told him she had to use the bathroom and went into the bathroom. (Id. at 188.) Breanna came into the bathroom and asked Hannah if she would like to split a fruit rollup. (Id.) Hannah was crying "[b]ecause I didn't really know what to do at that point." (Id. at 189.) Hannah asked Breanna "if Eric ever touched her" and "if she knew what he was doing," and Breanna said "yes." (Id.) Hannah then asked Breanna, "Has Eric ever done anything like that to you before?", and Breanna answered "no," but Hannah could tell she was lying. (Id. at 189, 207.)

The bathroom had two doors, and Hannah exited into a hallway, grabbed her backpack and shoes, and ran outside. (Id. at 190.) Ross chased her and she got as far as hiding behind some motorcycles in the yard before he found her. (Id.) He grabbed her arm and started back for the house; when he let go, she ran back to the house and he said he hurt his ankle. (Id.) They went in the house and Hannah sat on the stairs crying as Ross told her, "Sorry if I hurt you." (Id. at 191.) Hannah asked Ross if she could use his phone and go outside to talk, but he said no because she would run away again. (Id.) Ross allowed her to use the phone on the back porch, and she called Allan and told him what happened. (Id. at 191-92.) Hannah said at that point she was sad, as well as angry and upset with Ross, and said she "seriously wanted to hurt him." (Id. at 197-98.) Allan arrived five minutes later followed by the police. (Id. at 198.)

Karina K. testified that she is seventeen years old; Breanna is her cousin, the daughter of Karina's aunt Tami, and she occasionally babysits Breanna. (Lodgment No.

2, Rep.'s Appeal Tr. vol. 2, 213-16, Mar. 28, 2014, ECF No. 8 Attach. #4.)  When Karina was about fourteen years old, she visited Tami's house when only Ross and Breanna were home and found herself in a situation with Ross that made her uncomfortable.  (Id. at 216-17.)  Ross said he wanted to speak to Karina, took her into his bedroom, closed the door, pulled his pants down just far enough to display his penis, and said, "You can touch it if you want."  (Id. at 217-18, 225.)  He was holding and playing with his penis.  (Id. at 219.)  Karina said "no" and walked out of the bedroom.  (Id.)  He told her not to tell anyone and to keep it between them.  (Id. at 223.)  She did not tell anyone at the time because "I was scared he would, like, do something or, like, come after me or something."  (Id. at 219.)  She first told someone about that encounter when she heard what happened to Hannah and Breanna.  (Id. at 220.)  She said she did not notice any scars on his legs, but did not see his legs.  (Id. at 224-25.)

Melissa L. testified that she has been married to Allan since August 2010, and they have been together since October 2008.  (Id. at 227-28.)  During their marriage, they lived with her daughter Hannah full time and with Allan's daughter Breanna half of the time.  (Id. at 229.)  Breanna lived with her mother Tami and Tami's boyfriend Ross half of the time, and they all had a decent relationship regarding custody of Breanna.  (Id. at 230-33.)  They all eventually moved to Poway several blocks from each other, where the girls went to the same school.  (Id. at 232-34.)

On May 21, 2012, Melissa had to go to work early, and Hannah was dropped off at Tami and Ross's house in the morning to be taken to school with Breanna.  (Id. at 235.)  Melissa and Allan work together, and that morning, Allan came to her desk and told her they needed to leave because Ross had touched Hannah.  (Id. at 237-38.)  She called 911 while Allan drove them to Ross and Tami's house.  (Id. at 238.)  When they arrived, Breanna looked scared and Hannah looked angry and scared.  (Id. at 240.)  Melissa pulled Hannah outside, but when she tried to take Breanna, Ross put his arm in front of Breanna and said "she's not your kid.  You're not fucking taking her."  (Id.)  Allan then arrived at the door and told Ross "well, she's my daughter," and asked if he could speak to

Breanna.  (Id. at 241.)  Ross told Allan "You're not taking her, but you can come in."  (Id.)  Melissa admitted being hysterical at that point, and said she was screaming and "yelling some pretty vulgar things" at Ross in front of the children, including "you're a sick fucking bastard," but did not call Ross a child molester in front of the children.  (Id. at 245, 252.)  Melissa took Hannah to the car and Hannah told her what happened without being asked.  (Id. at 241-42.)  Allan came out of the house with Breanna, who was crying, and Melissa asked Breanna if Ross "has ever touched you."  (Id. at 242-43.)  Melissa said Breanna "put her head down and half looked back up at me and said, 'yes.'"  (Id. at 243.)  Allan appeared to be about to ask Breanna something but Melissa told him to stop; they would not discuss it at that time because the police were on the way.  (Id. at 243-44.)  The police arrived and took statements from Melissa and Allan out of earshot of Breanna and Hannah.  (Id. at 244.)

Breanna and Hannah were later interviewed at Palomar Hospital, and Melissa said she never spoke to either of them about what happened before or after those interviews, and she and Allan both told the girls "not to talk to each other about anything regarding anything about Eric."  (Id. at 244-45, 256.)  Over the course of Hannah's life, Melissa spoke to Hannah four or five times about good touching verses bad touching, and not to allow anyone to touch her in a private area.  (Id. at 246.)  Melissa said Allan and Ross were cordial to each other in general, but when it came to Breanna, they had issues about "everything," including the way she was raised, which activities she participated in, and where she went to school.  (Id. at 247.)  Whenever Allan tried to speak to Tami about Breanna, Ross "always took control over it and started with threats," such as involving lawyers, and Ross responded to e-mails Allan sent to Tami.  (Id.)  Melissa said she and Allan never said anything bad about Ross in front of the children.  (Id. at 247-48.)

On cross-examination, Melissa said she and Allan were not friends with Ross, but they all got along and were cordial with each other, and the four of them, including Tami, were always able to sit down together for constructive discussions about Breanna.  (Id. at 248-49.)  Melissa "never had a good feeling about" Ross, and "always felt there was

something off" due to the dynamics of his relationship with Tami, which Melissa described as manipulative. (Id. at 250.) She said Hannah had never run away or tried to run away from home. (Id. at 251-52.) Melissa thought Tami was too supportive of Ross and not supportive enough of Breanna because Tami took Ross to the hospital that day and allowed him to continue living at her house. (Id. at 263-64.)

Allan L. testified that he is married to Melissa and they each brought a child into the marriage. (Id. at 266.) Breanna is Allan's child with Tami. (Id. at 267.) Allan and Tami separated in 2007 or 2008, while they were living in Oregon. (Id. at 267, 271.) They met Ross when he was their real estate agent for a condominium they purchased in 1997. (Id. at 268.) Allan had a professional relationship with Ross, not a friendship, and they used him as their agent again in 1999 when they sold the condominium and bought a house. (Id. at 268-69.) Tami and Ross were in a wedding party together at one point, and Allan and Tami split up a month or two later, after which Tami moved to San Diego. (Id. at 269-71.) Allan blames Tami for ending their marriage, not Ross, and does not harbor resentment toward Ross on that basis. (Id. at 270.) Their custody arrangement was that Breanna would spend equal time with Tami and Allan; at first she spent six weeks with Allan in Oregon and six weeks with Tami in San Diego. (Id. at 271.) Allan felt he did not see Breanna enough, so he moved to San Diego. (Id. at 271-72.) Allan denied having any issues with Tami or Breanna living with Ross, and he described his relationship with Ross as civil and with Tami as cordial. (Id. at 273, 276.) Whenever there were disagreements regarding Breanna, the four of them - Melissa, Allan, Tami, and Ross - were able to sit down together and resolve them in a civil manner. (Id. at 274-75.)

On May 21, 2012, Melissa dropped Hannah off at Ross and Tami's house on her way to work. (Id. at 277.) Allan and Melissa work at the same office, and he was already at work when Hannah was dropped off that morning. (Id.) A little before 8:00 a.m., Hannah called Allan at work. (Id.) Hannah was hysterical and told Allan she did not want to be there and wanted him and Melissa to come get her. (Id. at 278.) Hannah

said only that Ross had touched her, nothing else, but Allan got "a gist of what that meant." (Id.) He calmly told Melissa what Hannah said, and they left work and drove together to Ross and Tami's house, about a four minute drive. (Id. at 278-79.) Melissa called the police on the way. (Id. at 279.) As they pulled up to the house, Melissa jumped out before the car came to a stop and ran to the front door. (Id.) By the time Allan had parked the car, Melissa was returning with Hannah. (Id.) Melissa went back to the house and tried to get Breanna but was not allowed inside. (Id.) Allan walked up behind Melissa as Ross told her, "You're not coming in here. She's not your daughter." (Id. at 280.) Allan told Ross she was his daughter, and Ross allowed him inside. (Id.) Allan picked up Breanna, who was crying, walked out into the back yard and closed the door behind them. (Id.) He told Breanna to calm down, told her "I'm going to ask you a question. I want an honest answer. I want a truthful answer." (Id. at 281.) He asked, "Has Eric ever touched you?" and she answered, "Yes." (Id. at 281-82.) He asked, "Where?" and she said, "My privates." (Id. at 282.) Allan was almost crying and Breanna cupped his cheeks and said, "Daddy, please don't cry." (Id.) When he carried Breanna back through the house, Ross was on the phone with Tami. (Id.) Allan took the phone and told Tami she needed to be there, the police were on the way, and he was taking Breanna. (Id. at 283.) Allan took Breanna outside, and the police arrived and took statements from Allan and Melissa but not from the girls. (Id. at 283-84.)

Allan had no further conversations with the girls about what happened, and the girls did not talk to each other about the events at that time or on the ride home. (Id. at 285-86.) The girls were interviewed at Palomar Hospital about a week later. (Id. at 286.) Allan said other than what was said at the time of the incident, neither he nor Melissa ever talked to the girls about what happened. (Id. at 286-87.) Prior to that day, neither Allan nor Melissa said anything negative about Ross or Tami in front of the children. (Id. at 287.)

On cross-examination, Allan said that Tami and Ross were in a wedding party while Allan was still married to Tami; about a month or two before they separated, Allan,

Tami, and Ross had a sexual encounter together.  (Id. at 287-88.)  Allan said Tami's relationship with Ross was the reason he and Tami divorced and made him upset with Tami, but reiterated that he had nothing against Ross and was not upset Breanna would be living with them.  (Id. at 288-90.)  Around the time of the May 21, 2012 incident, Tami and Ross had discussed the possibility of moving to Las Vegas, although their custody arrangement with Breanna precluded one or the other parent from taking her out of state without the other's permission, but Allan said he was not concerned.  (Id. at 290-91.)  In the four years Allan had known Hannah, he said she had not always been truthful, telling "little white lies that kids do."  (Id. at 299.)  She had run off from an adult at school when she was in the second or third grade because "she was upset about something, and her first instinct is to run."  (Id. at 300.)  Once or twice prior to May 21, 2012, Allan asked Breanna if Ross had ever touched her private parts or if anything inappropriate had ever happened, and she always said, "No."  (Id. at 292-93.)  From time to time when Allan, Melissa, Tami, and Ross would sit down to discuss Breanna, Ross would mention getting a lawyer, but it did not bother or upset Allan.  (Id. at 295-96.)

Robert Nicklo, a San Diego County Deputy Sheriff, testified that on May 21, 2012, at about 8:00 a.m., he responded to a report of suspected child abuse at a residence in Poway.  (Id. at 303-04.)  When he arrived, another deputy was speaking to the reporting parties, Allan L. and Melissa L.  (Id. at 304.)  Deputy Nicklo spoke to the suspect, Ross, and then conducted separate interviews with Allan and Melissa.  (Id. at 305-06.)  Allan was calm, Melissa was very upset, and Ross was in physical pain.  (Id. at 308.)  The children were not interviewed at the scene because his training dictates that highly trained specialized people conduct and record those interviews at a later date.  (Id. at 307.)

Dustin Lopez, a Sergeant with the San Diego County Sheriff's Department, testified that he received a call from the scene and took charge of arranging for Hannah and Breanna to be interviewed in a forensic setting by specialized social workers.  (Id. at 309-12.)  The interviews took place nine days after the incident, on May 30, 2012, and were observed by Sergeant Lopez.  (Id. at 312.)  He did not refer either girl for a physical

examination after their interviews because, as he explained, "Based on my experience and my training, after the nine days, the chance of getting any kind of touch DNA or any kind of DNA or physical findings is very limited." (Id. at 313.) The Sergeant was asked, "Is there also a portion of the protocol that deals with that?" (Id.) He replied, "There is some protocol put in place about the 72 hour policy, as far as, if anything goes past 72 hours, it needs to be vetted and looked at as far as what kind of sexual molestation it relates to." (Id.) He then added, "And, also, victims this young, I don't like to send victims for medical examinations if I don't believe there's going to be findings based on the fact that you're traumatizing young children with these medical examinations." (Id.) Because Breanna mentioned the use of a vibrator during her forensic interview, Sergeant Lopez searched Tami's home on May 30, 2012, pursuant to a warrant and asked Tami about its location. (Id. at 313-14.) The search revealed no sex devices, and Tami told Sergeant Lopez that Ross had moved out and, at her request, removed several items from the house in anticipation of a visit from Child Protective Services because she thought they might look bad. (Id. at 314-16.)

On cross-examination, when asked why no physical examination took place, Sergeant Lopez said, "I got from the forensic interviews of the girls[;] . . . it had been nine days past the time where the actual allegations had been made . . . . I just didn't think that it would be relevant at that point in time, that there would be any kind of evidence collected." (Id. at 318-19.) He stated it was possible a physical examination might have revealed evidence of sexual abuse. Lopez could not be certain one way or the other because it depends on numerous factors; but he thought it highly unlikely and decided not to have physical examinations based on the nature of the allegations by the girls, which did not include bleeding, scratching, bruising, or any physical injury; and the passage of nine days also made it unlikely that DNA could be recovered. (Id. at 319-24.) He acknowledged that a physical examination could have been performed within seventy-two hours and explained: "I did not have the facts of the case. I did not know the level of the allegations until the children were actually forensically interviewed." (Id. at

324.) Sergeant Lopez was the person who decided to schedule the interviews for nine days after the incident. (Id. at 324-25.) As far as he knew, no parent requested a physical examination, but he did not speak to them because he never speaks to "witnesses, victims or family members on how to direct [an] investigation." (Id. at 321.)

Christina Schultz, an interviewer with the Palomar Health Child Abuse Program who interviews children at the request of law enforcement or Child Protective Services, testified regarding her background, experience, and the protocol for interviews with suspected child abuse victims. (Lodgment No. 2, Rep.'s Appeal Tr. vol. 3, 335-40, Apr. 1, 2014, ECF No. 8 Attach. #5.) She interviewed Hannah and Breanna on May 30, 2012, and videotaped the interviews. (Id. at 340-43.) The interviews were played for the jury. (Id. at 345-46, 352-55.) Transcripts are in the record.[3] (Lodgment No. 1, Clerk's Tr. vol. 1, 0109-0201, ECF No. 8 Attach. #1.)

On cross-examination, Schultz was questioned about the suggestibility of child witnesses. She testified there were times during Breanna's interview when Breanna described events as if she had actually witnessed them but later said someone told her about them, which Schultz described as a "clarification." (Lodgment No. 2, Rep.'s Appeal Tr. vol. 3, 362, 369-73, Apr. 1, 2014, ECF No. 8 Attach. #5.) Schultz said her unit also conducts physical examinations in a room just down the hall from the interview room. (Id. at 362.) A team, which includes the referring detective, typically meets immediately after an interview to decide whether to recommend a physical examination, which could reveal tearing or scarring from even minor penile or digital penetration that occurred months or years earlier. (Id. at 363-67, 374.) Her team recommended a physical examination for Breanna but not for Hannah, and Schlutz admitted that a physical examination can be a mechanism to confirm a child's allegations. (Id. at 365-68.) She said her job when interviewing a child is not to determine if the child is lying or

---

[3] Counts ten and fifteen were the only counts involving Breanna which Ross was convicted of without trial testimony from Breanna; both pertain to using his finger to touch her vagina, which she described during her interview. (Id. at 0170, 0174, 0269, 0274.)

telling the truth, but just to gather information.  (Id. at 371.)

Laurie Fortin, the clinical coordinator of the forensic interview program at the Chadwick Center at Rady Children's Hospital, testified as to her training and experience, as well as the procedures and protocols for interviewing child abuse victims and minimizing suggestibility.  (Lodgment No. 2, Rep.'s Appeal Tr. vol. 3, 398, 401-16, Apr. 2, 2014, ECF No. 8 Attach. #5.)  A parent asking a child "what happened" is not considered suggestive.  (Id. at 421-22.)  On cross-examination, she said no effort is made during an interview to determine if a child is telling the truth or lying "because that's not our role."  (Id. at 417.)  Their role is to gather information from the child "using best practice techniques."  (Id. at 417, 424.)

The defense recalled Tami, who testified she did not remember if Ross has any scars in his groin area.  (Id. at 427-28.)  The defense admitted into evidence a copy of a restraining order filed on May 21, 2012, at 2:18 p.m., and rested.  (Id. at 429.)  A declaration from Melissa was attached to the restraining order and stated, "Upon the truth coming out, Breanna admitted that Eric has been touching her private areas.  It turned out to be a timeframe equivalent to approximately two years."  (Id. at 386.)

The prosecutor recalled Melissa and Allan in rebuttal over a defense objection.  (Id. at 452-58.)  Melissa testified that the statement she made in the application for the restraining order came from information she received from Allan on the day of the incident, who got it from Breanna that day.  (Id. at 460-62.)  Allan testified that on May 21, 2012, in the backyard of Ross and Tami's house, after he asked Breanna if Ross had touched her, and after Breanna grabbed his cheeks and told him not to cry, Allan asked her, "How long has this been happening?" and she replied, "It happened at the last apartment."  (Id. at 463-65.)  He then asked her why she had not told him when he had asked her in the past, and she said "she didn't tell me because she thought Eric was family, and she didn't want to hurt her family."  (Id. at 465.)  He told her, "Family doesn't do that."  (Id.)  That was the only time Allan asked Breanna about what happened between her and Ross.  (See id.)  He could not specifically remember if he reported to the

police everything Breanna told him that morning, but said, "I told them about every detail of the conversation I had in the backyard at that time." (Id. at 466-67.) Allan did not mention this discussion when he testified earlier in the trial because he had not been asked. (Id. at 468.)

Defense counsel argued in closing that the case came down to credibility and believability, and that the family dynamics showed Allan and Melissa wanted to remove Ross from the family and were willing to lie to do so. (Lodgment No. 2, Rep.'s Appeal Tr. vol. 3, 554-59, Apr. 3, 2014, ECF No. 8 Attach. #5.) Counsel argued that Allan, Melissa, and Tami all lied when they said they did not discuss the incident with the children. (Id. at 554-58.) For example, in her forensic interview, Breanna talked about things Hannah reported. (Id. at 555.) Additionally, Allan lied when he said he was not upset his marriage to Tami ended because of Ross, when Tami took their daughter to another state to live with Ross without asking his permission, or when Ross threatened to get lawyers involved in their custody arrangements. (Id. at 554-58.) Counsel pointed out that Melissa admitted she never liked Ross and that Allan had been questioning Breanna for some time about whether Ross touched her inappropriately; counsel argued that he was just waiting for Breanna to say yes for the "ultimate payback" to Ross. (Id. at 558-60.) Counsel pointed out that Schultz corrected Breanna three times during her interview about contradictory statements, Breanna and Allan both said Hannah is a liar, Breanna and Hannah described the events differently, and Breanna had been exposed to adult sexual activity when she walked in on Ross and Tami having sex and when she peeked at Petitioner's computer, which explained her ability to describe sex acts performed on her. (Id. at 561-63, 568-69.) As particularly relevant here, counsel argued it was unfortunate there were no medical examinations of the girls, which would have taken place just down the hall from the interviews, because it would have relieved the jury of having to decide if the girls were lying or telling the truth, and it was suspicious that Detective Lopez waited nine days to schedule the interviews and then said he did not order physical examinations because more than seventy-two hours had passed, despite the fact that he

and Schultz both said physical findings were still possible, when Schultz recommended one for Breanna, and when physical examinations can be requested by a parent.  (Id. at 563-65.)  Finally, counsel argued that Tami believed Ross at first because she allowed him to continue living with her, and she only changed her story when she realized she might lose custody of Breanna.  (Id. at 566-68.)

On April 4, 2014, after deliberating about five hours over two days, the jury returned verdicts as follows: (1) not guilty on count one, sexual penetration of Hannah (inserting his finger into her vagina in the master bedroom), but guilty of the lesser included offense of attempted sexual penetration; (2) guilty on count two of committing a forcible lewd act on Hannah (touching her vagina in the master bedroom), with a true finding it involved substantial sexual conduct but a not true finding it involved more than one victim; (3) guilty on count three of committing a lewd act on Hannah (touching her vagina with his hand in the living room), with a true finding it involved substantial sexual conduct and a true finding it involved more than one victim; (4) guilty on count four of oral copulation with Breanna (touching her vagina with his mouth in the old house); (5) guilty on count five of oral copulation with Breanna (a second incident of touching her vagina with his mouth in the old house); (6) guilty on count six of committing a lewd act on Breanna (touching her vagina with his hand in the old house), with a true finding it involved substantial sexual contact but a not true finding it involved more than one victim; (7) guilty on count seven of oral copulation with Breanna (touching his mouth to her vagina in the living room of the new house); (8) not guilty on count eight of sexual intercourse with Breanna (inserting his penis into her vagina in the living room of the new house), and not guilty of the lesser included offense of attempted sexual intercourse; (9) not guilty on count nine of committing a lewd act on Breanna (touching his penis to her vagina in the living room of the new house); (10) guilty on count ten of sexual penetration of Breanna (inserting an object into her vagina in the living room of the new house); (11) guilty on count eleven of committing a lewd act on Breanna (touching an object to her vagina in the living room of the new house), with a true finding it involved

substantial sexual conduct but a not true finding it involved more than one victim;

(12) guilty on count twelve of sexual penetration of Breanna (inserting his finger into her vagina in the living room of the new house); (13) guilty on count thirteen of committing a lewd act on Breanna (touching her vagina with his hand in the living room of the new house), with true findings it involved substantial sexual conduct and was committed against more than one victim; (14) guilty on count fourteen of oral copulation with Breanna (placing his mouth on her vagina in the bedroom of the new house); (15) guilty on count fifteen of sexual penetration of Breanna (inserting his finger into her vagina in the bedroom of the new house); (16) guilty on count sixteen of committing a lewd act on Breanna (touching his hand to her vagina in the bedroom of the new house), with a true finding it involved substantial sexual conduct but a not true finding it involved more than one victim; (17) not guilty on count seventeen of sexual intercourse with Breanna (inserting his penis into her vagina in the bedroom of the new house), and not guilty of the lesser included offense of attempted sexual intercourse; and (18) not guilty on count eighteen of committing a lewd act on Breanna (touching his penis to her vagina in the bedroom of the new house).  (Lodgment No. 1, Clerk's Tr. vol. 2, 0439-63, ECF No. 8 Attach. #2.)

On August 7, 2014, Ross, represented by new counsel, filed a motion for a new trial.  (Id. at 0306-22.)  He claimed he received ineffective assistance of counsel because his trial counsel (1) decided not to call Dr. Eisen, a child psychologist retained by the defense, to rebut the testimony of Laurie Fortin and explain how children are subject to suggestion; (2) failed to argue to the jury that Christina Schultz, the person who interviewed the girls, said Breanna recounted events which were told to her as if she had experienced them; (3) failed to impeach Tami and Hannah regarding Hannah's statement in her interview that she told Tami that Ross touched her prior to May 21, 2012, and failed to argue to the jury the failure to charge him with that incident showed a lack of confidence in Hannah's reliability; (4) failed to impeach Breanna, Tami, or Karina regarding why they did not see scars in Petitioner's groin area; and (5) assured Ross that

she would impeach prosecution witnesses on several issues or call him to testify as to those issues but failed to do so, including (a) why Karina, Hannah, or Breanna did not see his scars, (b) why a physical examination of the girls did not take place although Ross requested one, (c) the history of animosity against Ross by Allan and Melissa, (d) that Tami, Allan, and Melissa influenced the girls as to what they said about him, and (e) establishing that the girls saw the adults engage in sex to explain the girls' ability to describe the sex acts. (Id. at 0306-07, 0315-22.)

The trial court held an evidentiary hearing on the new trial motion at which Petitioner and his trial counsel testified. (Lodgment No. 2, Rep.'s Appeal Tr. vol. 4, 615-734, Sept. 26, 2014, ECF No. 8 Attach. #6.) Petitioner testified that he discussed with his attorney whether he would testify at trial and made it very clear to counsel he wanted the following issues brought out at trial, and was willing to testify if necessary: (1) he asked the police to search for DNA evidence and conduct a physical examination of the girls; (2) Breanna saw him having sex with Tami; (3) Allan disliked him because he dated Tami while they were still married, and Allan and Melissa testified falsely that they did not dislike him; (4) twice between the incident on May 21, 2012, and his arrest on May 30, 2012, he overheard conversations between Allan and Tami discussing the claims the girls had made against him; (5) Breanna once saw Allan having sex with his girlfriend; and (6) he has a one quarter inch wide and three or four inch long scar on the left side of his groin running from his pubic bone to his left hip bone, evidence that would have impeached Tami's testimony that she did not remember if he had such a scar, Karina's testimony that she did not see a scar, and testimony of Breanna and Hannah had they been asked if they saw a scar. (Id. at 619-34.) He also testified that defense counsel did not highlight to the jury Hannah's interview statement that Ross touched her on a previous occasion; Ross complained that the defense had Dr. Eisen ready to testify in the area of child psychology regarding suggestibility in children, but he was not called because counsel said the prosecution expert had covered the subject and Dr. Eisen's testimony "might go into areas she would rather not go into." (Id. at 620-34, 647.) When

Ross told counsel he wanted to testify, she told him it was too late because the defense had rested. (Id. at 634-37.)

Petitioner's trial counsel testified that she met and conferred with him regarding their trial strategy numerous times, and Ross provided her with a list of facts he wanted presented to the jury from his point of view. (Id. at 650-52.) They included animosity between himself, Allan, Melissa, and Tami, which she presented to the jury and covered in closing by arguing their animosity was a potentially motivating factor for them to suggest the children say something that did not occur. (Id. at 652, 654.) She described her decision not to call Dr. Eisen as a tactical one. (Id. at 654-55.) Dr. Eisen told her he wanted to hear Hannah and Breanna testify before deciding if he should testify, and after they testified, Dr. Eisen said it would do more harm than good to the defense for him to testify. (Id. at 675-76.) Counsel explained that to Petitioner and informed him she was not going to call Dr. Eisen. (Id. at 676.) Counsel spoke with Petitioner several times regarding his decision whether to testify, and she practiced direct and cross-examination with him while counsel mimicked the prosecutor. (Id. at 656-57, 687-88.) He indicated a desire to testify, and pointed out that he was articulate and had previous law enforcement experience in the military. (Id. at 656-58.) Counsel told him those things were good but she was a little concerned his experience showed he had an in-depth knowledge of things like investigation and evidence which could be used against him because there was testimony that he is manipulative and had a way of controlling people and situations. (Id. at 658.) Counsel was also concerned with the way Ross described Hannah, as he told counsel that Hannah is "not like a child at all. She's more like an adult. She's very manipulative. She's very savvy and sassy, . . . like her mother." (Id. at 658-59.) Counsel believed that if Petitioner described Hannah in that manner, it could reinforce her testimony that Petitioner told her she was developing into a young woman and was no longer a child. (Id. at 659.) Prior to resting her case, counsel advised Ross that if he testified he might do more harm than good to his case; she left the decision solely up to him, and informed him that the decision was his and he had to let her know if he wanted

to testify.  (Id. at 659-62.)  She remembered telling him that there were no more prosecution witnesses and if he wanted the things to come out which had not come out he would have to testify.  (Id. at 690.)  He never told her, before or after she rested the defense, that he wanted to testify.  (Id. at 662.)

The new trial motion was denied.  (Id. at 734.)  The trial judge found "insufficient evidence to demonstrate it's reasonably probable a more favorable result would have been obtained if [trial counsel] had accomplished the tasks that [counsel for Petitioner at the new trial motion] have suggested."  (Id.)  Petitioner was then sentenced to 120 years to life plus 17 years.  (Id. at 750-51.)

## III.   DISCUSSION

Petitioner claims his federal constitutional right to the effective assistance of counsel was violated because his trial counsel failed to call a child abuse pediatrics expert to testify that physical examinations should have been performed on the girls which would have been virtually certain to either verify their allegations or prove them false. (Pet. Attach. #2 Mem. 5-7, 26-33, ECF No. 1.)  He also contends the deference to the state court adjudication of his claim under 28 U.S.C. § 2254(d) does not apply because the state court unfairly rejected as untimely his reply brief and therefore did not consider the arguments presented or his request for oral argument.  (Id. at 34-37.)

Respondent answers that Ross is not entitled to federal habeas relief because the state court adjudication of his claim, on the basis that the decision of his trial counsel to forego calling an expert witness was neither deficient nor prejudicial, is objectively reasonable within the meaning of 28 U.S.C. § 2254(d).  (Answer Attach. #1 Mem. P. & A. 9-13, ECF No. 7.)  Petitioner replies by presenting declarations, which he presented to the state court, from his trial counsel, a child abuse pediatric expert, a criminal defense attorney with expertise in child sexual abuse trials, and his current counsel who also represented him in his state post-conviction proceedings.  (Traverse Attach. #3, 1-15, ECF No. 9; id. Attach. #4, 1-4.)

/ / /

## A. Standards of Review

In order to obtain federal habeas relief with respect to a claim adjudicated on the merits in state court, a federal habeas petitioner must demonstrate the following:

> [T]he adjudication of the claim - (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (West 2006).

Even if § 2254(d) is satisfied, a petitioner must still show that a federal constitutional violation occurred in order to obtain relief. Fry v. Pliler, 551 U.S. 112, 119-22 (2007); Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. In order to satisfy § 2254(d)(2), a petitioner must show the factual findings upon which the state court's adjudication of his claim rests are objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

With respect to the application of § 2254(d), the Supreme Court has stated:

> If this standard is difficult to meet, that is because it is meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state court proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions

17cv0953-JAH (RBB)

in the state criminal justice systems, not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, as state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (internal citations omitted).

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set forth in Strickland v. Washington, 466 U.S. 668 (1984). Petitioner must show that his counsel's performance was deficient, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. With respect to review of counsel's performance, the Supreme Court has stated:

A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Id. at 690.

"It will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that counsel rendered reasonable professional assistance." Kimmelman v. Morrison, 477 U.S. 365, 386 (1986) (quoting Strickland, 466 U.S. at 689).

A federal habeas petitioner must also show that counsel's deficient performance prejudiced the defense. Strickland, 466 U.S. at 691. Petitioner must show that his

"counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." Id. at 687. "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." Id. at 691-92. Thus, a showing of prejudice requires a demonstration of a reasonable probability that the result would have been different absent the error, that is, "a probability sufficient to undermine confidence in the outcome." Id. at 694. Both deficient performance and prejudice must be established in order to obtain relief. Id. at 687. "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

In addition, when § 2254(d) applies, a Strickland analysis is demanding.

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Richter, 562 U.S. at 105 (internal citations omitted).

**B.  Whether the state court adjudication of Ross's ineffective assistance of counsel claim is objectively reasonable within the meaning of § 2254(d)**

Petitioner raised the claim presented here in a habeas petition filed in the California Supreme Court. (Lodgment No. 12, In re Ross, No. [S232822] (petition for writ of habeas corpus), ECF No. 12 Attach. #1.) The petition was summarily denied with an order which states: "The petition for writ of habeas corpus is denied." (Lodgment No. 13, In re Ross, No. S232822, order at 1, ECF No. 12 Attach. #2.)

Petitioner also presented his claim to the state appellate court. (Lodgment No. 6, In re Ross, No. [D069126] (petition for writ of habeas corpus), ECF No. 8 Attach. #10.)

/ / /

The appellate court denied habeas relief in a reasoned opinion. (Lodgment No. 9, <u>In re</u> <u>Ross</u>, No. D069126, slip op., ECF No. 8 Attach. #13.)

The Court applies a presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-06 (1991). The Court will look through the silent denial of this claim by the California Supreme Court on habeas to the last reasoned state court opinion, the appellate court opinion denying habeas relief, which stated in relevant part:

> In the petition, Ross collaterally attacks the judgment on the ground of ineffective assistance of counsel, based on an error not raised in the appeal. Ross faults his counsel for not presenting testimony from a medical expert to refute the testimony of Dustin Lopez, a detective with the San Diego County Sheriff's Department, that it is SART (Sexual Abuse Response Team) protocol in a case of alleged vaginal penetration of a child not to <u>require</u> a medical examination if the most recent incident occurred more than 72 house earlier, because "the chance of getting . . . any kind of DNA or physical findings is very limited." The girls revealed the extent of the sexual abuse in forensic interviews conducted nine days after the last incident. Ross submits a declaration by Steven Gabaeff, M.D., which states damages from vaginal penetration "can be seen for years . . . after the alleged acts have occurred.", and Hannah's allegations of penetration with Ross's finger, and Breanna's allegation of penetration with his penis, vibrator, and finger, "mandated" examinations.

> Ross also submits a declaration by his trial counsel, Euketa Oliver, which states she spoke with Dr. Deborah Fitzgerald about the lack of medical examinations. Dr. Fitzgerald advised Oliver "it was unusual for a physical examination to not be done given the accusations and that if a physical exam had been performed in a timely manner, there most likely could have been physical findings if there in fact had been sexual penetration, particularly penile penetration. However, since one was not ordered, no one would be able to say there were injuries consistent or inconsistent with the allegations." Oliver explains she did not call a medical expert because there were no medical findings "to explain or challenge." Her declaration also states, "I made the tactical decision to cross exam[ine] the prosecution witnesses on the lack of physical examinations and argue the points on that topic in closing arguments."

We conclude Ross is not entitled to relief. Defense counsel has wide latitude in making tactical decisions, and "[j]udicial scrutiny of counsel's performance must be highly deferential." (Strickland v. Washington (1984) 466 U.S. 668, 689 (Strickland).) "It is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively. [Citations.] [¶] Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics." (People v. Floyd (1970) 1 Cal.3d 694, disapproved of on another ground in People v. Wheeler (1978) 22 Cal.3d 258, 287, fn. 36.)

Ross relies on opinions finding ineffective assistance based on counsel's failure to adduce medical evidence to challenge the prosecution's medical findings of sexual molestation. (In re Hill (2011) 198 Cal.App.4th 1008, 1023-1028; Gersten v. Senkowski (2d Cir. 2005) 426 F.3d 588, 594-596; Michael T. v. Commissioner of Corrections (2010) 122 Conn.App. 416, 423-425.) His reliance is misplaced, as here there were no medical findings to challenge. His assertion that Detective Lopez's understanding of SART protocol is a "medical opinion" is incorrect. Regardless of whether Detective Lopez should have ordered physical examinations, he did not do so, and we will never know whether either girl suffered vaginal injury (e.g., tears or scratches) indicative of penetration. The most a medical expert could testify to is that if the girls' testimony was truthful, examinations likely would have revealed injury. Ross admits "[w]e don't know for sure whether the evidence produced by the medical exam would have exonerated [him]." Oliver presumably realized medical expert testimony would not be exculpatory or add measurably to Ross's defense, because with or without it, the case hinged on the credibility of the girls' testimony. Under these circumstances, we cannot say Oliver's representation fell below an objective standard of reasonableness. (Strickland, supra, 466 U.S. at p. 688.)

Further, even if Oliver arguably erred, Ross has not shown prejudice. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." (Strickland, supra, 466 U.S. at p. 691.) "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Id. at p. 694.)

Oliver elicited testimony from Christina Schultz, who conducted the girls' forensic interviews at Palomar Hospital, that the hospital has a

physical examination unit located near the forensic interview unit, and at the conclusion of an interview a team may recommend that the child be examined, even if the alleged abuse occurred months or years before. Schultz's notes showed an examination was recommended for Breanna, but not for Hannah. Obviously, an examination would not have been recommended unless it was possible for injury to be detected long after it was inflicted, and thus Schultz's testimony belied Detective Lopez's testimony. Oliver emphasized the lack of physical evidence, but the girls' testimony was overwhelming. [¶] The petition is denied.

(Lodgment No. 9, In re Ross, No. D069126, slip op. at 2-3, ECF No. 8 Attach. #13.)

For the following reasons, the Court finds the determination by the state court that defense counsel was not deficient in failing to call an expert and Ross was not prejudiced by that decision, is objectively reasonable within the meaning of 28 U.S.C. § 2254(d), as are the factual findings upon which that determination rests. Testimony was presented at trial from Christina Schultz, the person who interviewed the victims, that because Hannah alleged digital penetration of her vagina there was a possibility that a physical examination could reveal tearing, scaring, or DNA evidence which could have been used to confirm her allegations. (Lodgment No. 2, Rep.'s Appeal Tr. vol. 3, 362, 366-68, Apr. 1, 2014, ECF No. 8 Attach. #5.) She said a physical examination can confirm a child's allegations and that one was recommended for Breanna but not conducted. (Id. at 365-68.)

Detective Lopez testified that he was in charge of scheduling the interviews of the children, and scheduled them for nine days after the allegations were made. (Lodgment No. 2, Rep.'s Appeal Tr. vol. 2, 312, Mar. 28, 2014, ECF No. 8 Attach. #4.) He testified that he did not refer either victim for a physical examination because "[b]ased on my experience and my training, after the nine days, the chance of getting any kind of touch DNA or any kind of DNA or physical findings is very limited." (Id. at 313.) He said protocol requires that any allegation of molestation over seventy-two hours old "needs to be vetted and looked at as far as what kind of sexual molestation it relates to. [¶] And, also, victims this young, I don't like to send victims for medical examinations if I don't

believe there's going to be findings based on the fact that you're traumatizing young children with these medical examinations." (Id.)

On cross-examination, Detective Lopez was asked again why there were no physical examinations conducted, and said, "Because the information I got from the forensic interviews of the girls, what they said had actually occurred, it had been nine days past the time where the actual allegations had been made on the 21st. [¶] I just didn't think that it would be relevant at that point in time, that there would be any kind of evidence collected." (Id. at 318-19.) Under further questioning by defense counsel, Lopez testified it was possible that a physical examination might have determined or detected evidence of sexual abuse, and that he could not be certain one way or the other as it depends on numerous factors. (Id. at 319-22.) When asked by defense counsel if a physical examination could have been performed within seventy-two hours, Detective Lopez stated, "It could have, but I did not have the facts of the case. I did not know the level of the allegations until the children were actually forensically interviewed." (Id. at 324.) He also said that as far as he knew no parent requested a physical examination, although he said he did not speak to any parent, as he never speaks "to witnesses, victims or family members on how to direct my investigation." (Id. at 321.)

Defense counsel argued to the jury in closing:

> Now, it would have been nice - - it would have been so nice if we had a medical examination. It would have been so nice if we had some kind of medical findings in this case to help shed some light on what happened.

> It would be nice because the medical findings - - we would not have to kind of sift through those to see if those are telling the truth or if those are lying. Those would have been concrete. [¶] Unfortunately, we don't have those. Now, when Detective Lopez was questioned, "why didn't you do any medical findings?" he kind of gave me the runaround.

> "Well," he said, "there's a 72-hour rule. And, you know, I don't order them if it's beyond 72 hours because I don't believe that they're going to yield significant results." [¶] Well, then why did you schedule the interview for nine days later? [¶] Why would you do that? [¶] We know that these medical examinations can be done any time at these hospitals. [¶] So then

why would you wait until you believe that there may not be any physical evidence? [¶] Why? [¶] Unless you did not believe that a physical examination would yield any evidence based upon what you heard in those particular interviews and what you knew about the case.

Even after Breanna had her interview, the team met - - that team included Detective Lopez and, they said, I think - - Miss Schultz said, I think, that maybe she should have a medical examination done. [¶] It could have been conducted right down the hall, right then. We could have got to the bottom of this. No medical examination at all.

Now, it's funny how Detective Lopez said that there's this 72-hour rule, but then, when Miss Schultz was questioned, she said that she's seen medical examinations ordered for kids who disclose about a - - less abuse that happened days, weeks, months, even years prior. [¶] Why would anyone order a medical evaluation years after the alleged incident if they didn't think they could find anything? [¶] Why? [¶] Because they know that, if you do a medical examination, you can still find evidence that something has occurred. [¶] Detective Lopez says, "Well, I will only order them after the 72 hours if there was something that I believe happened." [¶] And you have his testimony. You can ask for it back. [¶] He said, "I'll order it after 72 hours if I believe something happened."

But, after the interviews, even though the team said, "maybe we should have one," he never ordered one. He never ordered one, despite the fact that he said that he has done so in the past if he believed something happened.

We also found out from Miss Schultz that not only does law enforcement - - is it their responsibility to make the request for the medical examination, but she also said that the parents - - that they have a say-so in whether or not a medical examination is going to be done. Yet, no medical examination [was] done in this case.

(Lodgment No. 2, Rep.'s Appeal Tr. vol. 3, 563-65, Apr. 3, 2014, ECF No. 8 Attach. #5.)

Petitioner presents a declaration from his trial counsel stating that on March 31, 2014, after the victims testified but before their interviews were played for the jury, she consulted with two fellow deputy public defenders in her office regarding Detective Lopez's failure to order medical examinations. (Traverse Attach. #3, 1, ECF No. 9.)

Based on that consultation, defense counsel that same day spoke with Dr. Deborah Fitzgerald, an obstetrician and gynecologist, who said it was unusual for a physical examination not to have been performed in this case, and if it had "there most likely could have been physical findings if there in fact had been sexual penetration especially with a penis. However, since one was not ordered, no one would be able to say there were injuries consistent or inconsistent with the allegations." (Id. at 9-10.) Counsel states:

> Since there was no physical examination ordered, I did not call Dr. Deborah Fitzgerald or any other medical doctor to talk about the lack of a physical examination because there was no evidence for a doctor to explain or challenge. I made the tactical decision to cross exam the prosecution witnesses on the lack of physical examinations and argue the points on that topic in closing arguments.

(Id. at 10.)

The jury was instructed that even slight penetration is sufficient to convict Petitioner on the penetration counts. (Lodgment No. 2, Rep.'s Appeal Tr. vol. 3, 484, Apr. 2, 2014, ECF No. 8 Attach. #5.) Ross was acquitted on the charge he penetrated Hannah's vagina with his finger, the only allegation of penetration with Hannah. (Lodgment No. 1, Clerk's Tr. vol. 2, 0443, ECF No. 8 Attach. #2.) Of the five counts alleging penetration of Breanna's vagina, Ross was acquitted of the two which involved his penis, and found guilty of the two which involved his finger and the one which involved the silver dildo, all of which the jury found to have occurred between June 1, 2011 and May 21, 2012. (Id. at 0451, 0454, 0456, 0459, 0462.) Thus, Ross was acquitted of half the penetration counts, all of which were alleged to have occurred within a year of the girls' forensic interviews.

Those verdicts were consistent with the girls' testimony. When Hannah was asked to explain how Ross touched the inside part of her bikini area with his hand, she said: "I don't really know how to describe it. Just touched me there." (Lodgment No. 2, Rep.'s Appeal Tr. vol. 2, 186-87, Mar. 27, 2014, ECF No. 8 Attach. #4.) When examining Breanna about how Ross touched her, the prosecutor asked, "On the times that he would

use his hands to touch your private, did he touch the outside or the inside of your private. Do you remember?" and she answered, "I think it was only the outside, maybe." (Id. at 105.) When asked similar questions, she answered, "I'm pretty sure the outside," and "I think on the outside." (Id. at 110-11.) She testified that he put the silver dildo inside her private part. (Id. at 115.) During her interview, Breanna said Ross put his finger inside her private part. (Lodgment No. 1, Clerk's Tr. vol. 1, 0170, 0174, ECF No. 8 Attach. #1.)

Petitioner presents several declarations in an attempt to rebut the strong presumption that defense counsel made a reasonable tactical decision to challenge the prosecution witnesses on the lack of physical examinations and argue to the jury that physical examinations could have obviated the need to determine if the children were telling the truth or lying, rather than call an expert to essentially repeat what Schultz and Detective Lopez had admitted on cross-examination. First is the declaration of his current counsel in this matter, who also represented Ross in his state habeas proceedings, and whose firm represented him on the new trial motion. (Traverse Attach. #4 Decl. Ford, ECF No. 9.) Counsel states that Dr. Fitzgerald told him that if she had been asked by Petitioner's counsel, she would have said a medical examination should be conducted any time a child claims to have been vaginally penetrated because the examination would likely show signs of scarring even if DNA, semen, and saliva would no longer be available. (Id. at 2-3.)

Petitioner presents a declaration from Dr. Steven Gabaeff, a physician specializing in child abuse cases and a past supervisor of the San Diego SART program, who opines that Detective Lopez opted not to have the victims undergo physical examinations "for reasons that do not comport with medical or police practices," and that he compounded that error by making the decision without consulting the SART team or the lead physician. (Id., Attach. #3 Decl. Gabaeff 3, ECF No. 9.) In Dr. Gabaeff's opinion the nine-day delay, during which the children lived with adults harboring significant animus toward Ross, subjected the victims to suggestions and amplification of the allegations against Ross which became "true" in their minds, as shown by Breanna thrice reporting

things she was told by Hannah as if they had happened to her. (Id. at 3-4.) He states that even if penetration occurred months earlier, "[a]bsent evidence of penetration, their stories of penetration would be shown to be false." (Id. at 6.) Finally, he states that "[i]f the defendant committed the acts he was accused of, it is virtually certain the medical exam would have shown it." (Id.)

Finally, Petitioner presents a declaration from Robert Boyce, a criminal defense attorney with experience in child abuse cases, who states that the decision by Petitioner's trial counsel "not to call a medical doctor was not a reasonable tactical decision." (Id., Attach. #3 Decl. Boyce 12, 14, ECF No. 9.) He opines that "[r]easonably competent counsel in the present situation would have presented a medical expert to explain to the jury that a medical exam would likely have shown whether the girls' allegations of penetration were true or false." (Id. at 14.) He concludes that such evidence could be used to argue bias on the part of Detective Lopez, and "[i]n fact, the law provides that the state's failure to collect or preserve important evidence may, by itself, be sufficient to establish reasonable doubt and the jury may be instructed on that point. (See, People v. Wimberly (1992) 5 Cal.App.4th 773, 793.)" (Id.)

Although testimony was presented at trial by Christina Schultz and Deputy Lopez that a physical examination of the victims might have revealed evidence Ross penetrated their vaginas with his finger, or Breanna's vagina with his penis or the silver dildo, they also acknowledged that the examinations might be equivocal or produce no evidence, and that it was impossible to say. Ross argues his defense would have been bolstered had counsel called an expert such as Dr. Gabaeff to testify that it is "virtually certain" that "their stories of penetration would be shown to be false" if a physical examination had been conducted and no injuries consistent with penetration observed. (Traverse Attach. #3 Decl. Gabaeff 6, ECF No. 9.) He further argues that "cross-examination of a hostile, unqualified police officer is no substitute for expert testimony from a neutral, qualified medical doctor." (Id., Attach. #3 Decl. Boyce 14.)

/ / /

As Petitioner concedes (see Pet. Attach. #2 Mem. 33, ECF No. 1), and the state court observed, because no physical examinations were conducted, it is impossible to know what they would have shown, if anything. It was reasonable for defense counsel, after consulting with Dr. Fitzgerald, to rely on the testimony of Schultz and Detective Lopez that the allegations of penetration might have been confirmed or contradicted by a physical examination, and then argue it was unfortunate, and suspicious, that no physical examinations were conducted despite Schultz's recommendation. Defense counsel took advantage of Detective Lopez's failure to order physical examinations to argue to the jury that he did not believe the girls' allegations because he was aware a physical examination could detect injuries arising from such allegations months later, and could be used to confirm the allegations or expose them as false. Petitioner has not shown counsel was deficient in this respect. See Strickland, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.")

Although Petitioner contends a doctor testifying as an expert would be more authoritative than a social worker and a police officer, defense counsel was aware of that distinction because she spoke with Dr. Fitzgerald before deciding not to call an expert. In addition, defense counsel testified at the new trial motion that she retained Dr. Eisen, a child psychologist, and discussed the girls' testimony with him immediately after they testified. (Lodgment No. 2, Rep.'s Appeal Tr. vol. 4, 675-76, Sept. 26, 2014, ECF No. 8 Attach. #6.) Thus, her decision was based on consultation with Dr. Fitzgerald, a medical expert similar to the one Ross contends should have been called to testify, and with a child psychologist. Accordingly, Petitioner's contention that the decision not to call an expert was based on a failure to investigate, (see Pet. Attach. #2 Mem. 19-24, ECF No. 1), is not supported by the evidence. Ross has not shown deficient performance. See Strickland, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]")

/ / /

Petitioner contends that counsel should have called an expert witness to testify that it was "virtually certain" a physical exam would have proved or disproved the allegations of penetration as Dr. Gabaeff opined, rather than that it was merely "possible" to do so as Schultz and Deputy Lopez testified. (Pet. Attach. #2 Mem. 31-32, ECF No. 1.) Additionally, defense counsel could have asked the trial court to instruct the jury that they were permitted to draw an adverse inference from the failure to preserve that evidence, and that such an inference may by itself be sufficient to raise a reasonable doubt as to Petitioner's guilt. (Id.) California law provides that such an instruction may be appropriate where there is willful destruction or failure to preserve evidence. See Wimberly, 5 Cal. App. 4th at 793, 7 Cal. Rptr. 2d at 263-65 (citing People v. Sassounian, 182 Cal. App. 3d 361, 395, 226 Cal. Rptr. 880, 898 (1986)). Ross appears to argue that the failure to preserve evidence was willful because it was unreasonable for Deputy Lopez to wait nine days before arranging for the victims to be interviewed while at the same time saying the interviews provide the information he needs to make the decision whether to refer the victims for physical examinations. (Pet. Attach. #2 Mem. 32, ECF No. 1.) Schultz testified that injuries from penetration could be revealed months or years after the alleged abuse. The expert opinion offered by Ross says the same thing. Thus, the decision to wait nine days for the interviews does not amount to a failure to preserve evidence, willful or otherwise.

Based on an assessment of defense counsel's "overall performance throughout the case," the Court finds Petitioner has not "overcome the presumption that [his] counsel rendered reasonable professional assistance." Kimmelman, 477 U.S. at 386. In light of the admonishment by the Supreme Court that "[t]he standards created by Strickland and [section] 2254(d) are both 'highly deferential' . . . and when the two apply in tandem, review is 'doubly' so," Richter, 562 U.S. at 105 (citations omitted), the Court finds that the state court determination that defense counsel was not deficient in failing to present expert testimony is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in

light of the evidence presented in the state court proceedings.  See Richter, id. ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.")

The Court reaches the same conclusion as to prejudice.  In rejecting Ross's assertion he was prejudiced by the failure to call an expert to testify that Detective Lopez violated protocol in ignoring Schultz's recommendation for a physical examination, and to rebut Detective Lopez's opinion that it was unlikely a physical examination would reveal injuries in this case, the state court observed, "Obviously, an examination would not have been recommended unless it was possible for injury to be detected long after it was inflicted, and thus Schultz's testimony belied Detective Lopez's testimony.  Oliver emphasized the lack of physical evidence, but the girls' testimony was overwhelming." (Lodgment No. 9, In re Ross, No. D069126, slip op. at 3, ECF No. 8 Attach. #13.)

As set forth above, the jury was instructed that even slight penetration is sufficient to convict Ross on the penetration counts, and the verdicts were consistent with the girls' testimony and statements regarding penetration.  The significance of expert testimony that physical examinations would have been virtually certain to prove or disprove whether penetration occurred was lessened by the girls' trial testimony that they did not think they were penetrated or were unsure if they were.  The only trial testimony concerning penetration was Breanna's testimony that Ross put the silver dildo inside her private part, and the only other evidence of penetration was her statement during the forensic evidence that he put his finger inside her private part.  Because there is nothing in the record to undermine the state court determination that the testimony of the victims constituted overwhelming evidence of guilt, the state court determination of a lack of prejudice is neither contrary to, nor involves an unreasonable application of, Strickland, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  See Strickland, 466 U.S. at 699 (finding lack of prejudice from overwhelming evidence); Murray v. Schriro, 882 F.3d 778, 825 (9th Cir.

2018) ("[T]he overwhelming evidence of guilt forecloses any credible argument that the outcome of the trial would have been affected by the proffered exculpatory evidence.")

The state court determination of lack of prejudice based on the manner in which defense counsel dealt with the lack of physical evidence and failure to conduct physical examinations is also objectively reasonable. As discussed above, defense counsel argued to the jury in closing that (1) physical examinations of the girls would have obviated the need for the jury to decide if they were telling the truth or lying; (2) it was suspicious that Detective Lopez did not order examinations and was inconsistent in his answers and reasons for failing to do so; and (3) they could draw a reasonable conclusion that Detective Lopez did not believe the girls' allegations. (Lodgment No. 2, Rep.'s Appeal Tr. vol. 3, 563-65, Apr. 3, 2014, ECF No. 8 Attach. #5.) Counsel therefore took advantage of the lack of physical examinations to argue they would have obviated the need for the jury to rely on a determination of whether the children were telling the truth; counsel also argued that the failure to conduct examinations, combined with other challenges to the girls' veracity, raised doubt as to the integrity of the prosecution's case. Those other challenges included that the children were susceptible to manipulation by their parents, in particular by Allan who repeatedly asked Breanna if Petitioner had touched her, just waiting for her to say yes for "the ultimate payback" to Ross for ending Allan's marriage and interfering with his parental rights by threatening to take his child out of state. (Id. at 558-60.) Counsel also argued that Melissa joined Allan in disliking Ross, pointed out that Melissa admitted she never liked or trusted Ross and always thought something was off about him, and that Tami initially believed Ross but only changed her mind when it appeared she might lose custody of her daughter to Allan and Melissa. (Id. at 558-59, 567-68.)

As Petitioner concedes and the state court observed, it will never be known what physical examinations would have revealed. The allegations of penetration by the girls were weak, as they were insufficient to support convictions on the four counts alleging penetration by Ross's penis, and defense counsel argued that physical examinations

38

should have been conducted and would have been but for Detective Lopez's suspicious and unaccountable intervention. The state court reasonably found that very little would have been added to the efficacy of the defense if expert testimony had been offered that it is "virtually certain" the allegations of penetration would have been verified or proven false by physical examinations. As Respondent pointed out in the state habeas proceedings, the penetration alleged by the victims included not just digital penetration but penetration of very young girls by the penis of a large adult, and the expert opinion offered by Petitioner that injuries would be virtually certain relied at least in part on such penetration, which the jury ultimately rejected. (Lodgment No. 7, In re Ross, No. D069126, 6-7[4] (informal response), ECF No. 8 Attach. #11.) In any case, Schultz and Detective Lopez both testified that even digital penetration could leave evidence in the form of scratches or tearing weeks or months later, and Detective Lopez testified that his decision to not order physical examinations was also based on the fact that the victims did not mention such injuries during their interviews. (Lodgment No. 2, Rep.'s Appeal Tr. vol. 2, 320-22, 325-26, Mar. 28, 2014, ECF No. 8 Attach. #4; id. vol. 3, 367, 374, Apr. 1, 2014, ECF No. 8 Attach. #5.)

In light of the nature of the testimony regarding penetration and the fact that the victims did not report physical injuries, that Petitioner was acquitted on the counts of penetration with his penis, and the manner in which defense counsel handled the lack of physical findings, it was objectively reasonable for the state court to find that Ross was not prejudiced by the failure to present expert testimony that the penetration alleged by the victims was virtually certain to be confirmed or disconfirmed by physical examination. See Strickland, 466 U.S. at 694 (holding that in order to show prejudice, a petitioner must demonstrate "a probability sufficient to undermine confidence in the outcome[]"); see also Richter, 562 U.S. at 110 ("Representation is constitutionally

---

[4] Because Lodgment No. 7 is not consecutively paginated, the Court has paginated the document and will cite it using the assigned page numbers.

ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial.") (quoting <u>Strickland</u>, 466 U.S. at 686).  Neither is there any basis to find that the factual findings upon which the state court's adjudication of Petitioner's claim rests are objectively unreasonable.  <u>Miller-El</u>, 537 U.S. at 340.

Cognizant of the admonishment by the Supreme Court that "[t]he standards created by <u>Strickland</u> and [section] 2254(d) are both 'highly deferential' . . . and when the two apply in tandem, review is 'doubly' so," <u>Richter</u>, 562 U.S. at 105 (citation omitted), the Court finds that federal habeas relief is unavailable because the state court adjudication of Petitioner's claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  The Court **RECOMMENDS** the Petition be **DENIED**.

### C.     Whether Petitioner has shown that 28 U.S.C. § 2254(d) is applicable

Finally, Petitioner argues that the deference required by 28 U.S.C. § 2254(d) is not applicable here because the fact-finding process by the state appellate court was deficient under <u>Taylor v. Maddox</u>, 366 F.3d 992, 1000-01 (9th Cir. 2004) (construed in <u>Murray v. Schriro</u>, 745 F.3d 894, 999-1000 (9th Cir. 2014)), as the state court failed to consider his habeas reply brief and request for oral argument.  (Pet. Attach. #2 Mem. 34-37, ECF No. 1.)  Specifically, he challenges the state court finding that defense counsel "presumably realized medical expert testimony would not be exculpatory or add measurably to Ross's defense," arguing his "reply brief explains exactly how the medical testimony would have been devastating to the state's case, as the jury would have been informed it was 'virtually certain' the tests would have shown whether or not the girls had been penetrated."  (<u>Id.</u> at 35.)  He contends the state court erred in finding that "it was possible" an injury could be detected long after it was inflicted, whereas his state court reply brief pointed out that was an understatement.  (<u>Id.</u>)  Finally, he takes exception to the state court finding that the girls' testimony was overwhelming, arguing that his reply

brief pointed out the inconsistencies in their testimony, that Breanna and Allan acknowledged that Hannah was known to lie, and that Schultz did not believe some of Breanna's claims.  (Id. at 35-36.)

The Court in Taylor found that the failure of the state court "to consider, or even acknowledge, . . . highly probative testimony cast[] serious doubt on the state-court fact-finding process," which required the federal habeas court "to set those findings aside and . . . make new findings."  Taylor, 366 F.3d at 1005-08.  But Ross's appellate court habeas petition, which is titled "Petition for Writ of Habeas Corpus with Memorandum of Supporting Points and Authorities and Exhibits," contains the following internal passage:

> Dr. Gabaeff concludes "there can be no excuse for not conducting the medical exam after two young girls claimed to have been vaginally penetrated multiple times.  If the defendant committed the acts he was accused of, it is virtually certain the medical exam would have shown it." (Exh. A, p. 5.)  "Absent evidence of physical penetration, their stories of penetration would be shown to be false."  (Exh. A, p. 5.)

(Lodgment No. 6, In re Ross, No. [D069126] (petition for writ of habeas corpus at 11), ECF No. 8 Attach. #10.)  Two nearly identical passages are repeated in the petition.  (Id. at 23, 32.)  Ross also pointed out that the testimony of the girls contained inconsistencies, that both Breanna and Allan acknowledged that Hannah was known to lie occasionally, and that Schultz did not believe some of Breanna's claims.  (Id. at 7, 9, 36.)

Thus, the arguments and declaration of Dr. Gabaeff Petitioner contends were not considered by the appellate court on habeas because they were contained in the rejected reply brief, were in fact before the appellate court when it considered his habeas petition. Ross has failed to show the state court failed to consider any argument or evidence presented in the state court proceedings.  Furthermore, there is no support for his contention that the state court's failure to consider his request for oral argument in his reply brief precludes application of the standards set forth in 28 U.S.C. § 2254(d).  The Court therefore recommends rejecting Petitioner's contention that 28 U.S.C. § 2254(d) is not applicable in this proceeding.

# IV.   CONCLUSION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **August 10, 2018**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **August 31 , 2018.**  The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

Dated:  July 19, 2018

Hon. Ruben B. Brooks
United States Magistrate Judge

17cv0953-JAH (RBB)