1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   RICHARD ERIC ROSS,                  Case No.: 3:17-cv-00953-JAH-BLM

12                          Petitioner,   **ORDER:**

13   v.
                                          **(1) ADOPTING THE MAGISTRATE**
14   JEFF MACOMBER, Secretary of the      **JUDGE'S REPORT AND**
     California Department of Corrections and   **RECOMMENDATION;**
15   Rehabilitation,

16                          Respondent.   **(2) DENYING PETITION FOR WRIT**
                                          **OF HABEAS CORPUS, AND;**
17
                                          **(3) DENYING CERTIFICATE OF**
18                                        **APPEALABILITY**
19
                                          **(ECF No. 13)**
20

21

22              **I.    INTRODUCTION**[1]

23       Petitioner Richard Eric Ross ("Ross" or "Petitioner"), a state prisoner represented

24   by counsel, has filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.

25   ("Pet." ECF No. 1-2).  After careful consideration of the pleadings, the lodgments and other

26

27   _____

28   [1]     Pursuant to Fed. R. Civ. P. 25(d), Jeff Macomber has been substituted as Secretary
     of the California Department of Corrections and Rehabilitation.

                                            1

documents submitted by the parties, the legal arguments and the relevant law, and for the reasons set forth below, this Court **OVERRULES** the objections, **ADOPTS** Judge Brooks' report, **DENIES** the Petition in its entirety and **DENIES** a certificate of appealability.

## II.   FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35–36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness).  On direct appeal, the California Court of Appeal recited the facts as follows:

> Tami R. and Allan L. married in 1996, and their child Breanna was born in 2004. Tami and Allan met Ross in 2001 through a real estate transaction. On one occasion in 2007, they engaged in a "threesome" after attending a wedding. Approximately two months later, Tami and Allan separated. She began dating Ross, and in 2009 they began living together. She and Allan shared equal physical custody of Breanna.
>
> In 2010 Allan married Melissa L. Melissa has a daughter, Hannah, who is approximately a year older than Breanna. Hannah and Breanna attended the same school, and occasionally when Allan and Melissa went to work early they would drop Hannah off at Tami and Ross's home for a ride to school.
>
> On May 21, 2012, Ross was scheduled to take both girls to school. Melissa dropped Hannah off at his home early that morning. Tami was upstairs getting ready for work. Ross asked Hannah for a hug, and she complied. He gave her some cereal, and after she ate he said, "Come here, I want a better hug." He hugged her and said, "You're almost a woman," and, "You have perfect legs." He touched her thighs, "bikini area," bottom, and chest, over her clothes. She tried to get away from him, but he tightly gripped her waist. Ross was watching a video on his computer, which she described as "this girl" and "some guy" "doing stuff" to each other "on the counter of [a] library."

Hannah went upstairs to find Breanna. Ross also went upstairs. After Tami left for work, Breanna asked him if he would play a game called "find us," in which the girls would hide under the covers of the bed in the master bedroom and he would try to pull them out of bed by their feet. Ross pulled Hannah out of bed by her waist, and her pants were pulled down "a little bit." She thought it was an accident, and she pulled them back up.

After the game, Ross and the girls stayed in the bed and watched television. Hannah was between Ross and Breanna, and they were all under the covers. He pulled Hannah's pants and underwear down to her knees and put his finger on the "inside part" of her "bikini area."

Hannah was frightened, and she told Ross she had to use the bathroom. She pulled up her clothing and went to the bathroom and cried. Breanna followed her. Hannah asked whether Breanna knew what Ross had done, and Breanna said she did. Hannah also asked if Ross ever touched Breanna, and she denied any touching.

Hannah went downstairs and ran out the front door barefoot. Ross chased after her and found her hiding behind some motorcycles. He grabbed her arm, and when he let go she ran to the house to get her backpack. He chased her again, but he hurt his ankle. He and Breanna went into the house and she "sat on the stairs, crying." He said, "Sorry if I hurt you." She asked to use a phone and Ross complied. She reached Allan and told him Ross had touched her. She was "hysterical" on the phone.

Allan and Melissa immediately went to retrieve Hannah. Melissa grabbed Hannah and took her to the car. Hannah "was bawling" and told Melissa what happened. Ross initially objected to Breanna leaving the house, but Allan was able to remove her. She was also crying. Melissa asked Breanna if Ross had ever touched her, and she pointed to her "private parts" and said he had touched her there.

Allan and Melissa had called 911, and deputy sheriffs arrived and took statements from them and Ross. They did not take statements from Breanna or Hannah, because in sexual abuse cases involving young children there are "specialized people that do the interviews."

///
///

On May 30, 2012, the children underwent videotaped forensic interviews at a hospital. The interviews were admitted into evidence at trial. Additionally, Breanna and Hannah testified. Hannah testified to the above facts from the May 21, 2012 incident.

Breanna testified to a lengthy course of sexual abuse by Ross. Breanna lived with Tami and Ross in three different homes, and she did not recall any abuse in the first home. She testified that in the living room of the second home, Ross "was touching me . . . whenever my mom was . . . at work." She said he touched her with his hands and his mouth "[i]n my private parts," the area where "pee comes out." She said he would pull her pants and underwear off. He would ask her to remove her shirt, and she would comply. He touched her bare skin more than once, and he touched her over her clothes once. When asked whether he touched the outside or inside of her private part, she responded, "I think it was only the outside, maybe." She also said he "would lick my private part." He once promised her ice cream in exchange for the touching, but he did not follow through.

Breanna testified that in the second home, she saw Ross's "private part," meaning the "part that a boy pees out of." She said they both had their clothes off and "he peed on me, in my private part, the one below the stomach. And I didn't like it." She described the feeling as "weird and stinging." After he peed on her he "just went to the bathroom to get a towel." Before peeing on her, he put "liquid stuff" that "looks like water" on her private part. When asked whether he ever "touch[ed] your private with his private," she responded, "Not that I know of, no."

Further, Breanna testified that in the third home, Ross "kept on doing it," and "I said to stop it," but "I don't think he ever did." She said, "He would do the same thing. He would touch me in my private parts." He would ask her to take her shirt off, and he would pull her pants off. He touched the skin on the outside of her private part more than once. He also put his mouth on her chest "more than once, but not very often." She explained that he "would make me lie upside down" on the couch so he could touch her private part. He told her, "It's okay," and, "Don't tell anybody." She said she was too scared to tell anyone "[b]ecause I thought he was going to get me in trouble because he looked like a really strong guy."

///

Additionally, Breanna testified that Ross put "a little buzzy toy" inside her private part. She explained it "had a little buzzy thing on the very top," and "it was kind of like the microphone thing at the very bottom, but it was fatter." The first time he used it on Breanna, he said, "I got us a new toy." The "toy" had different speed settings, and he would ask her, "Would you like it on low, medium or fast?" She said, "I think he turned it onto medium, and he would just put it on my private part, and it would buzz." She could feel the buzz inside and outside of her private part. She told Ross, "I didn't want to use it anymore, so he said he would throw it away, but he didn't. And then he said I could. And I threw it away."

As to the May 21, 2012, incident, Breanna denied seeing Ross touch Hannah. Breanna said "it looked like something happened in the bed" because Hannah "ran into the bathroom and was freaking out." Hannah told Breanna, "I'm scared," and, "I'm grabbing my backpack and running to school or walking." Breanna saw Hannah run from the home and Ross run after her. When they returned, Hannah asked for the phone so she could call her mother, and Breanna heard Ross say, "Don't tell her what happened."

Tami testified she kept two vibrators in her nightstand, one of which she called the "silver bullet," along with a clear lubricant. Before the May 21, 2012, incident, Ross called Tami at work and told her he had thrown the silver bullet away because "he went upstairs and heard something in the drawer, opened it, and noticed the vibrator . . . was on, and thought that it could be a fire hazard or something." Tami also testified that after the sheriffs left her home after the incident with Hannah, she took Ross to a hospital because "[h]e said he tore his achilles tendon from running after Hannah."

Karina K., a cousin of Breanna, testified that when she was 14 years old she visited Breanna and Ross in their home when Tami was away. Ross took Karina into a bedroom and closed the door. He pulled down his pants to expose his penis and said, "You can touch it if you want." He was holding his penis "and playing with it." Karina said no and left the room. She did not report the incident because Ross told her to "keep this between them" and she "was scared he would . . . do something or . . . come after me."

///

Ross's defense theory was that Breanna and Hannah were lying, and their claims resulted from suggestions given by Allan and Melissa. Ross argued that Allan hated him because the "threesome" resulted in the breakup of his marriage to Tami, and Melissa disliked him because she believed he was controlling and manipulative in matters pertaining to Breanna. Allan was supposedly "looking for this opportunity for the ultimate payback," and intended "to break up [Ross's] life the same way he broke up his marriage." Allan's "number one goal" was supposedly to "remove him from that family so that they can continue going on about their business without him."

Defense counsel also emphasized the prosecution had no physical evidence. A detective testified he did not request medical examinations of the girls because nine days had passed between the incident with Hannah and their forensic interviews, when the extent of the molestations was revealed, and he believed examinations conducted more than 72 hours after a molestation would not yield results. Defense counsel criticized the detective for not having forensic examinations conducted earlier, and she challenged his belief that medical examinations must be conducted within 72 hours to yield results.

(Resp't's Lodgment No. 8, ECF No. 8-12 at 2-8) (footnotes omitted).

## III.   PROCEDURAL BACKGROUND

An amended information was filed against Ross on October 25, 2012, charging him with sexual penetration of Hannah C., a child ten-years-old or younger, in violation of California Penal Code § 288.7(b) (count 1); sexual penetration of Breanna L., a child ten-years-old or younger, in violation of California Penal Code § 288.7(b) (counts ten, twelve, and fifteen); committing a forcible lewd act upon Hannah C. in violation of California Penal Code § 288(b)(1) (count two); committing a lewd act upon Hannah C. in violation of California Penal Code § 288(a) (count 3); committing lewd acts upon Breanna L. in violation of California Penal Code § 288(a) (counts six, nine, eleven, thirteen, sixteen, and eighteen); oral copulation with Breanna L., a child ten-years-old or younger, in violation of California Penal Code § 288.7(b) (counts four, five, seven, and fourteen); and sexual intercourse with Breanna L., a child ten-years-old or younger, in violation of California

Penal Code § 288.7(a) (counts eight and seventeen). (Resp't's Lodgment No. 1, ECF No. 8-1 at 84-91).  With respect to counts two, three, six, nine, eleven, thirteen, sixteen, and eighteen, it was further alleged that the offenses were committed against more than one person, in violation of California Penal Code § 667.61(b)(c)(e), and involved substantial sexual conduct with the victim in violation of California Penal Code § 1203.066(a)(8). (*Id.*)

On April 4, 2014, a jury found Petitioner not guilty on count one as to sexual penetration, but guilty of the lesser offense of attempted sexual penetration of a child ten-years-old or younger. (Resp't's Lodgment No. 1, ECF No. 8-2 at 159-60). The jury further found Petitioner not guilty on counts eight, nine, seventeen, and eighteen, and guilty as to the remaining counts. (*Id.* at 159-79).  The jury also found that substantial sexual conduct occurred with Hannah C. as to two counts, substantial sexual conduct occurred with Breanna L. as to four counts, and an offense was committed against more than one victim as to two counts. (*Id.* at 161-62, 165, 171, 173, 176). The jury returned not true findings that substantial sexual conduct occurred as to counts nine and eighteen, and not true findings that an offense was committed against more than one victim as to counts two, six, nine, eleven, sixteen, and eighteen. (*Id.* at 161, 165, 169, 171, 176, 179).

On August 7, 2014, Petitioner filed a motion for new trial with the trial court, alleging ineffective assistance of counsel for trial counsel's ("counsel", "trial counsel", or "defense counsel") failure to call a child psychologist on the suggestibility of children, provide exculpatory evidence, impeach witnesses as to testimony involving key issues, and for failing to call Petitioner as a witness.  (*Id.* at 22-38).  Petitioner's motion for a new trial was denied, (*id.* at 182), and he was subsequently sentenced to 120-years to life plus 17 years, in state prison.  (*Id.* at 162-181, 183).

Following sentencing, Petitioner directly appealed to the Court of Appeal of the State of California, Fourth Appellate District, again alleging that trial counsel rendered ineffective assistance of counsel. (Resp't's Lodgment No. 3 ECF No. 8-7).  The Court of Appeal subsequently affirmed the Superior Court's judgement in a reasoned order.

(Resp't's Lodgment No. 8, ECF No. 8-12).   On February 16, 2016, Petitioner filed a petition for review in the California Supreme Court, once again raising a claim for ineffective assistance of counsel. (Resp't's Lodgment No. 10, ECF No. 8-14).   The California Supreme Court summarily denied Ross' Petition for Review. (Resp't's Lodgment No. 11, ECF No. 8-15).

On October 27, 2015, concurrent to filing his direct appeal, Petitioner filed a habeas petition in the state appellate court raising a claim for ineffective assistance of counsel. (Resp't's Lodgment No. 6, ECF No. 8-10).   The Attorney General's Office filed an informal response on December 3, 2015.   (Resp't's Lodgment No. 7, ECF No. 8-11). Petitioner filed a reply brief, which was subsequently rejected as untimely. (*See* Pet. at 34).   On January 15, 2015, the appellate court denied habeas relief in a reasoned, unpublished order.   (Resp't's Lodgment No. 9, ECF No. 8-13).   Petitioner thereafter filed a habeas petition in the California Supreme Court on February 26, 2016, which again raised the ineffective assistance of counsel claim. (Resp't's Supp. Lodgment No. 12, ECF No. 12-1).   Petitioner's habeas petition was summarily denied.   (Resp't's Supp. Lodgment No. 13, ECF No. 12-2).

Petitioner then filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 in this Court on May 8, 2017.   (Pet.)   Respondent filed an Answer to the Petition and a memorandum of points and authorities in support of the answer, ("Answer" ECF No. 7-1), and Petitioner filed a traverse, ("Traverse" ECF No. 9).   Pursuant to 28 U.S.C. § 636(b)(1), the Honorable Ruben B. Brooks, United States Magistrate Judge, submitted a Report and Recommendation ("Report") to this Court recommending denial of the Petition. ("R&R" ECF No. 13).   Petitioner filed objections to the Report.   ("Obj." ECF No. 14).

## IV.   APPLICABLE LEGAL STANDARDS

### A.   <u>Antiterrorism and Effective Death Penalty Act</u>

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").   *See Lindh v. Murphy*, 521 U.S. 320 (1997).   Under

AEDPA, a habeas petition will not be granted unless the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).

A federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable.  *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).  In order to grant relief under § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record."  *See Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), abrogated on other grounds by *Murray v. Schriro*, 745 F.3d 984 (9th Cir. 2016).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts.  *See Bell v. Cone*, 535 U.S. 685, 694 (2002).  The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case.  *Id.*  Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable."  *See Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003).  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Williams v. Taylor*, 529 U.S. 362, 411 (2000).  "A state court's determination that a claim

lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805–06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000); accord *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d), means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 71-72.

**B.   Magistrate Judge's Report and Recommendation**

The district court's role in reviewing a magistrate judge's report and recommendation is set forth in 28 U.S.C. § 636(b)(1). Under this statute, the district court "shall make a de novo determination of those portions of the report . . . to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge]." *Id.* When no objections are filed, the Court may assume the correctness of the magistrate judge's findings of fact and the district court is not required to conduct a de novo review of the magistrate judge's report and recommendation. *See Wang v. Masaitis*, 416 F.3d 992, 1000 n.13 (9th Cir. 2005) (stating that "de novo review of a R & R is only required when an objection is made"). However, whereas here, a Petitioner files an objection to a magistrate judge's report and

recommendation, a de novo review is, in fact, required. *United States v. Reyna–Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (holding that 28 U.S.C. § 636(b)(1)(c) "makes it clear that the district judge must review the magistrate judge's findings and recommendations de novo if objection is made, but not otherwise").

## V.   DISCUSSION

### A.   <u>The Petition</u>

Petitioner alleges that "his trial counsel rendered ineffective assistance by failing to present an expert witness whose testimony would have debunked the state's theory at trial," Pet. at 5), while recognizing that "counsel made the tactical decision to address the issue by cross-examining the state's witnesses and arguing the issue briefly during closing argument." (Pet. at 17). Similarly, the Petition notes that "[t]rial counsel did not call … any [] medical expert to the stand because no exam had been done by the state so 'there was no evidence for a doctor to explain or challenge.'" (*Id.* at 16-17). Petitioner asserts that course of conduct warrants relief, arguing that "counsel *needed* to present a medical expert to rebut the investigating officer's premise that an exam would not likely have produced results." (Pet. at 29 (emphasis added)). In support of this argument, Petitioner presents testimony from a medical expert who maintains that "if the petitioner committed the charged acts 'it is virtually certain the medical exam would have shown it[]' and '[a]bsent evidence of any physical penetration [the girls[']] stories of penetration would be shown to be false.'" (Pet. at 29). Petitioner concludes that counsels conduct was ineffective for "failing to present an expert witness who would have explained this critical point to the jury." (Pet. at 6).

Petitioner further alleges that the Court of Appeal ruling is not entitled to deference under AEDPA since it was the result of a flawed fact-finding process. (Pet. at 34). Petitioner concedes that his reply brief was electronically filed one day late. (*Id.*) Nevertheless, Petitioner argues that the Court of Appeal's decision not to consider the reply brief resulted in an "adopt[ion of] the Attorney General's arguments without considering petitioner's strong arguments in response." (*Id.* at 35). As a result, the Court of Appeal's

decision concluded that "medical testimony would not be exculpatory or add measurably to Ross's defense," and "that counsel's mistake showed no prejudice under *Strickland* because 'the girls' testimony was overwhelming.'" (*Id.* at 35, 36-36 (citations omitted)). Additionally, Petitioner asserts that by not considering the reply brief, "the court of appeal also overlooked petitioner's counsel's request for oral argument." (*Id.* at 37). Petitioner therefore concludes that the state court's determination of the facts was unreasonable as a result of the defects in the fact-finding process. (*Id.* at 35 (citing *Taylor*, 366 F.3d at 1000-01)).

**B.   The Report and Recommendation**

*1. Ineffective Assistance of Counsel*

In the Report, Judge Brooks initially reviewed whether the state court's adjudication of Petitioner's ineffective assistance of counsel claim (1) was objectively reasonable within the meaning of § 2254(d), and (2) whether such assistance was subsequently prejudicial to Petitioner.

With respect to the "objectively reasonable" prong of the *Strickland* test, the court found that "[b]ased on an assessment of defense counsel's 'overall performance throughout the case,' ... Petitioner has not overcome the presumption that [his] counsel rendered reasonable professional assistance." (R&R at 36 (alteration in original) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986)). In particular, the Report finds that because no physical examinations were conducted, "[i]t was reasonable for defense counsel, after consulting with Dr. Fitzgerald[2], ... to then argue it was unfortunate, and suspicious, that no physical examinations were conducted despite Schultz's[3] recommendation." (*Id.* at 35). The Report duly recognizes that counsel "took advantage of Detective Lopez's failure to order physical examinations to argue to the jury that he did

---

[2]   Dr. Deborah Fitzgerald ("Dr. Fitzgerald") is an obstetrician and gynecologist. (footnote not in original).

[3]   Christina Schultz is a social worker who conducted the girls' forensic interviews at Palomar Hospital. (footnote not in original).

not believe the girl's allegations because he was aware a physical examination could detect injuries … and could be used to confirm the allegations or expose them as false." (*Id.*)  As a result, the Report concludes that Petitioner failed to show that counsel was deficient with respect to her manner of representation.  (*Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 689 (1984) ("There are countless ways to provide effective assistance in any case. Even the best criminal defense attorneys would not defend a particular client in the same way.")).  Similarly, the Report found that because defense counsel "spoke with Dr. Fitzgerald before deciding not to call an expert," Petitioner also failed to support the allegation of ineffective assistance based on counsel's failure to investigate.  (*Id.* at 35). Thus, based on counsel's tactical decisions, made after a consultation with Dr. Fitzgerald, the Report concludes that,

> the state determination that defense counsel was not deficient in failing to present expert testimony is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

(*Id.* at 36-37 (citing *Harrington v. Richter*, 562 U.S. 86, 105 (2011)).

The Report reached the same conclusion as to the prejudice element of the *Strickland* analysis.  The Report notes that "[t]he significance of expert testimony that physical examinations would have been virtually certain to prove or disprove whether penetration occurred was lessened by the girls' testimony that they did not think they were penetrated or were unsure if they were."  (R&R at 37).  Based on the overwhelming evidence of guilt against Petitioner resulting from the girls' testimony, the Report concluded that the state court of appeal's determination of a lack of prejudice did not violate the reasonableness standards set forth in *Strickland*.  (*Id.* 37-38).  The Report further concluded that counsel's manner in dealing with the lack of physical evidence and failure to conduct physical examinations was also objectively reasonable and not prejudicial, finding that "[t]he state court reasonably found that very little would have been added to the efficacy of the defense if the expert testimony had been offered that it is 'virtually certain' the allegations of

penetration would have been verified or proven false by physical examinations." (*Id.* at 39). Rather, counsel's conduct in otherwise "rais[ing] doubt as to the integrity of the prosecution's case," coupled with Petitioner having been "acquitted on the counts of penetration with his penis," resulted in an objectively reasonable determination by the state court of appeal that "Ross was not prejudiced by the failure to present expert testimony that the penetration alleged by the victims was virtually certain to be confirmed or disconfirmed by physical examination." (*Id.* at 38-39).

> 2. *Applicability of § 2254(d)*

Next, the Report addresses Petitioner's contention that deference to § 2254(d) is inappropriate because of a flawed fact-finding procedure at the state appellate level. (*Id.* at 40). The Report rejected Petitioner's arguments, noting that the information contained in the rejected, untimely reply brief was also contained in the petition before the reviewing court. (R&R at 41). As such, the Report concluded that Petitioner has failed to show the state court did not consider any argument or evidence presented in the state court proceedings. (*Id.*) The Report further stated that Petitioner also fails to provide any support for his contention that the state court's failure to consider his request for oral argument in his reply brief precludes application of the standard set forth in § 2254(d). (*Id.*)

**C.   Petitioner's Objections**

Petitioner asserts five objections to the Report and Recommendation. The first objection is two-fold: Petitioner asserts the magistrate judge erred in finding that trial counsel's informal discussion with a medical expert amounted to a consultation. Rather, Petitioner urges this Court to find that trial counsel failed to investigate a viable defense, by not presenting a medical expert to illicit testimony that evidence of forcible penetration would be visible in a physical exam, thereby physical examination would have undoubtedly "debunk[ed] the investigating officer's reason for not having a medical exam done[.]" (Opp'n to R&R at 6-7).

///

///

Second, Petitioner asserts the magistrate judge erred in rejecting the criminal defense expert's opinion that medical evidence disputing the detective's theory *had to be* presented to the jury. (*Id.* at 7 (emphasis added)).

Third, Petitioner contends that the magistrate judge further erred by finding trial counsel's decision did not result in any prejudice to petitioner. (*Id.*) Specifically, Petitioner argues that since "one accuser claimed multiple acts of forced vaginal penetration involving use of petitioner's penis, tongue, fingers and a vibrator," the Report's assertion that the jurors "might have concluded there were only slight penetrations, the type that would not produce medical evidence," was flawed. (*Id.*) Rather, the significance of the allegations contradicts the inference that evidence of penetration "would [not] show up in an examination [and] is consistent with the position that the allegations were fabricated." (*Id.*)

Fourth, Petitioner criticizes the Report for not considering factors associated with Petitioner's innocence, such as the history of the parents, the truthfulness of the accuser, and the social worker's acknowledgement that some allegations were a product of suggestibility. (*Id.* at 8).

Lastly, Petitioner objects to the Report's finding that the rejected reply brief and requested oral argument is flawed because the facts contained in the original petition submitted to the state court, it was "overlooked by the respondent and the court thereafter accepted the respondent's argument." (*Id.* at 10). Thus, in Petitioner's view, by "[r]esolving the present petition after reading the state's response without any reference to the petitioner's informal reply reduced the credibility of the factfinding process." (*Id.*)

///
///
///
///
///
///

**C.     Analysis**

>    *1.     Applicability of 28 U.S.C. § 2254(d)[4]*

Petitioner contends that the Court of Appeal's denial of his writ of habeas corpus is not entitled to deference under AEDPA because it was the result of a deficient fact-finding process as the Court failed to consider Petitioner's reply brief and request for oral argument.[5] (Pet. at 34).  Petitioner asserts that in failing to consider the reply brief, the state court adopted the response's erroneous conclusion that "trial counsel 'presumably realized medical expert testimony would not be exculpatory or add measurably to [Petitioner's] defense.' " (Pet. at 35).  Petitioner claims that had the state court given due consideration to the reply brief, Petitioner would be able to explain "exactly how the medical testimony would have been devastating to the state's case, as the jury would have been informed it was 'virtually certain' the tests would have shown whether or not the girls had been penetrated."  (*Id.*)  Petitioner further asserts that in failing to consider his reply brief, testimony regarding the true importance of having elicited medical testimony, and the fact that the victims' stories were inconsistent, were not taken into consideration by the state court of appeal.  (Pet. at 35-36).

This Court agrees with and adopts Judge Brooks' recommendation that the fact-finding process was not deficient, as the declarations Petitioner purports to have probative value were submitted with Petitioner's appellate court habeas petition.  As noted in the Report, the state court petition included a declaration from Dr. Steven Gabaeff, an expert on child abuse pediatrics, and included the following excerpt, amongst others of similar substance:

>    Dr. Gabaeff concludes "there can be no excuse for not conducting the
>    medical exam after two young girls claimed to have been vaginally

---

[4]     Although Petitioner presents this as a secondary argument, the Court addresses the appropriate standard of review first as it informs the discussion on the ineffective assistance of counsel claim.

[5]     Petitioner concedes that he electronically filed the reply brief "one court-day after its due date."  (Pet. at 18).

> penetrated multiple times.  If the defendant committed the acts he was
> accused of, it is virtually certain the medical exam would shown it."
> "Absent evidence of physical penetration, their stories of penetration
> would be shown to be false."

(Resp't's Lodgment No. 6, ECF No. 8-10 at 11) (citations omitted).   Petitioner subsequently includes further testimony and observations made by Dr. Gabaeff as to Detective Lopez's failure to order medical examinations, (*id.* at 12-14), and includes mention as to the inconsistencies prevalent in the victims' testimony and that the social worker who interviewed the victim's "didn't believe" some of their claims, (*id.* at 7, 9, 36). Even Petitioner concedes that although he did "note th[ese] important fact[s] in the original petition, … it was overlooked by the respondent and the court thereafter accepted the respondent's argument." (Obj. at 9).[6]

In addressing Petitioner's arguments, the appellate court noted the declaration of Dr. Gabaeff and found that, "regardless of whether Detective Lopez should have ordered physical examinations, he did not do so, and we will never know whether either girl suffered injury . . . indicative of penetration."  (Resp't's Lodgment No. 9, ECF No. 8-13 at 2-3).  The appellate court did not discuss any inconsistencies in the victims' testimony, nor was it required to do so.  *See Taylor*, 366 F.3d at 1001 (citing *Miller-El*, 537 U.S. at 347 ("[W]e are mindful that the state courts are not required to address every jot and tittle of proof suggested to them, nor need they "make detailed findings addressing all the evidence before [them].")).  Of import, the appellate court noted trial counsel's emphasis on the lack of physical evidence but noted "the girls' testimony was overwhelming."  (Resp't's

---

[6]     Petitioner relies on *Taylor v. Maddox* to support the argument that the state court's determination of the facts was unreasonable due to a deficient fact-finding process.  366 F.3d at 1000-01.  Relevant here, the Ninth Circuit in *Taylor* found the state court's fact-finding process flawed where "the state court has before it, yet apparently ignores, evidence that supports petitioner's claim."  *Id.* (citing *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003)).  Petitioner here must demonstrate that the "overlooked or ignored evidence [is] highly probative and central to petitioner's claim."  366 F.3d at 1001.

Lodgment No. 9, ECF No. 8-13 at 3).  Petitioner otherwise fails to point to a specific fact that was not before the court in the original petition that was not considered in the rejected reply brief.

Petitioner further asserts that in failing to consider the reply brief, the court of appeal also overlooked petitioner's request for oral argument. (Obj. at 37).  Petitioner argues that "Judges are people, not machines.  While they may read something in a brief, they may need clarification … especially where the facts are complicated." (*Id.* at 10-11). Petitioner's attempt to obfuscate responsibility for the consequences of an untimely filed reply brief is unpersuasive.  Petitioner attempts to frame this issue as though the appellate court "overlooked" the request for oral argument, (*id.* at 37), resulting in a deficient process, when in fact, Petitioner's counsel sent a reply brief via United States mail during the time the California Court of Appeal for the Fourth Appellate District transitioned to a mandatory electronic filing system for all writ proceedings. (Pet. at 34).  As such, the reply brief was untimely, which resulted in the Court of Appeal rejecting the reply brief and request for oral argument. (*Id.* at 18, 34).  As a represented party, Petitioner provides no adequate reason to relieve him from the rules of appellate procedure, nor does he present any case law that would support such a proposition. Therefore, this Court reviews Petitioner's claims with the deference required under AEDPA. *See* 28 U.S.C. § 2254(d).

## 2.  *Ineffective Assistance of Counsel*

To establish ineffective assistance of counsel under federal law, Petitioner must prove: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 688, 694, 696.  A reasonable probability of a different result "is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  The Court may reject the claim upon finding either that counsel's performance was reasonable or that the claimed error was not prejudicial. *Id.* at 697; *see also Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002) ("Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other.").

Review of counsel's performance is "highly deferential" and there is a "strong presumption" that counsel rendered adequate assistance and exercised reasonable professional judgment. *Williams v. Woodford*, 384 F.3d 567, 610 (9th Cir. 2004) (quoting *Strickland*, 466 U.S. at 689). The Court must judge the reasonableness of counsel's conduct "on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. The Court may "neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight." *Matylinsky v. Budge*, 577 F.3d 1083, 1091 (9th Cir. 2009) (citation omitted). Petitioner bears the burden to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotations omitted).

The Supreme Court has explained how to analyze *Strickland* in the context of AEDPA:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citations omitted).

Petitioner asserts that he was denied his right to effective assistance of counsel. Specifically, Petitioner argues that his trial counsel's failure to present a medical expert to rebut the state's medical strategy constituted ineffective assistance of counsel. Rather, Petitioner alleges that trial counsel merely "asked a couple of questions when cross-examining the state's police investigator and social worker who acknowledged that it was possible an exam would have confirmed the claims." (Pet. at 6).

///

Respondent rebuts the allegations in Petitioner's writ, contending that trial counsel's tactical choice not to present medical expert testimony was reasonable under the circumstances, and the state court reasonably rejected Petitioner's claim of ineffective assistance of counsel. (Answer at 8). Respondent further asserts that Petitioner's reliance on opinions finding ineffective assistance of counsel based on a failure to adduce medical testimony is misplaced because there was no medical findings in the instant matter for trial counsel to challenge. (*Id.* at 9). Because Ross' petition for writ of habeas corpus to the California Supreme Court was denied without comment or citation, this Court therefore "looks through" to the appellate court's denial of the claim. *See Ylst*, 501 U.S. at 805–06. There, the appellate court in an unpublished, reasoned opinion stated in relevant part:

> In the petition, Ross collaterally attacks the judgment on the ground of ineffective assistance of counsel, based on an error not raised in the appeal. Ross faults his counsel for not presenting testimony from a medical expert to refute the testimony of Dustin Lopez, a detective with the San Diego County Sheriff's Department, that it is SART (Sexual Abuse Response Team) protocol in a case of alleged vaginal penetration of a child not to *require* a medical examination if the most recent incident occurred more than 72 house earlier, because "the chance of getting . . . any kind of DNA or physical findings is very limited." The girls revealed the extent of the sexual abuse in forensic interviews conducted nine days after the last incident. Ross submits a declaration by Steven Gabaeff, M.D., which states damages from vaginal penetration "can be seen for years . . . after the alleged acts have occurred,", and Hannah's allegations of penetration with Ross's finger, and Breanna's allegation of penetration with his penis, vibrator, and finger, "mandated" examinations.
>
> Ross also submits a declaration by his trial counsel, Euketa Oliver which states she spoke with Dr. Deborah Fitzgerald about the lack of medical examinations. Dr. Fitzgerald advised Oliver "it was unusual for a physical examination to not be done given the accusations and that if a physical exam had been performed in a timely manner, there most likely could have been physical findings if there in fact had been sexual penetration, particularly penile penetration. However, since one was not ordered, no one would be able to say there were injuries

consistent or inconsistent with the allegations." Oliver explains she did not call a medical expert because there were no medical findings "to explain or challenge." Her declaration also states, "I made the tactical decision to cross exam[ine] the prosecution witnesses on the lack of physical examinations and argue the points on that topic in closing arguments."

We conclude Ross is not entitled to relief. Defense counsel has wide latitude in making tactical decisions, and "[j]udicial scrutiny of counsel's performance must be highly deferential." (*Strickland v. Washington* (1984) 466 U.S. 668, 689 (*Strickland*).) "It is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively. [Citations.] [¶] Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics." (*People v. Floyd* (1970) 1 Cal.3d 694, disapproved of on another ground in *People v. Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36.)

Ross relies on opinions finding ineffective assistance based on counsel's failure to adduce medical evidence to challenge the prosecution's medical findings of sexual molestation. (*In re Hill* (2011) 198 Cal.App.4th 1008, 1023-1028; *Gersten v. Senkowski* (2d Cir. 2005) 426 F.3d 588, 594- 596; *Michael T. v. Commissioner of Corrections* (2010) 122 Conn.App. 416, 423-425.) His reliance is misplaced, as here there were no medical findings to challenge. His assertion that Detective Lopez's understanding of SART protocol is a "medical opinion" is incorrect. Regardless of whether Detective Lopez should have ordered physical examinations, he did not do so, and we will never know whether either girl suffered vaginal injury (e.g., tears or scratches) indicative of penetration. The most a medical expert could testify to is that if the girls' testimony was truthful, examinations *likely* would have revealed injury. Ross admits "[w]e don't know for sure whether the evidence produced by the medical exam would have exonerated [him]." Oliver presumably realized medical expert testimony would not be exculpatory or add measurably to Ross's defense, because with or without it, the case hinged on the credibility of the girls' testimony. Under these circumstances, we cannot say Oliver's representation fell below an objective standard of reasonableness. (*Strickland*, *supra*, 466 U.S. at p. 688.)

Further, even if Oliver arguably erred, Ross has not shown prejudice. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." (*Strickland*, *supra*, 466 U.S. at p. 691.) "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

Oliver elicited testimony from Christina Schultz, who conducted the girls' forensic interviews at Palomar Hospital, that the hospital has a physical examination unit located near the forensic interview unit, and at the conclusion of an interview a team may recommend that the child be examined, *even if the alleged abuse occurred months or years before*. Schultz's notes showed an examination was recommended for Breanna, but not for Hannah. Obviously, an examination would not have been recommended unless it was possible for injury to be detected long after it was inflicted, and thus Schultz's testimony belied Detective Lopez's testimony. Oliver emphasized the lack of physical evidence, but the girls' testimony was overwhelming.

The petition is denied.

(Resp't's Lodgment No. 9, ECF No. 8-13 at 2-3).

### a.      *Trial Counsel's Performance*

Under *Strickland*, this Court presumes that counsel acted competently, and Ross must rebut this presumption by showing that counsel's "performance was objectively unreasonable under prevailing professional norms and was not the product of sound strategy." *Duncan v. Ornoski*, 528 F.3d 1222, 1234 (9th Cir. 2008) (citing *Strickland* 466 U.S. at 688-89)). Although the Supreme Court has declined to delineate specific guidelines to determine the appropriateness of counsel's conduct in this context, the Ninth Circuit has held that "[a] lawyer who fails adequately to investigate and introduce . . . [evidence] that demonstrate[s] his client's factual innocence, or that raise[s] sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999).

After the victims' allegations of sexual misconduct against Petitioner, Sergeant Lopez of the San Diego County Sheriff Department's Child Abuse Unit was tasked with scheduling forensic interviews as per the Department's protocol. (Resp't's Lodgment No. 2, ECF No. 8-4 at 312).  Sergeant Lopez subsequently scheduled the interviews for nine days after the alleged incidents occurred. (*Id.*)  Testimony was presented at trial from Christina Schultz ("Schultz"), a social worker who interviewed the victims, that based on her discussion with one of the victims, she had "suggested a medical exam be done." (Resp't's Lodgment No. 2, ECF No. 8-5 at 368).  Despite Schultz's recommendation, however, Sergeant Lopez did not refer either of the victims for physical examinations. (Resp't's Lodgment No. 2, ECF No. 8-4 at 313).

After the victim's testified, but before the testimony was presented to the jury, defense counsel consulted two colleagues as to Sergeant Lopez's failure to order a medical examination.  The colleagues subsequently recommended she consult with Dr. Fitzgerald. (Oliver Decl. ECF No. 9-3, Ex. B at ¶¶ 5-6).  Dr. Fitzgerald informed counsel that "it was unusual for a physical examination to not be done given the accusations and that if a physical exam had been performed *in a timely manner*, there most likely could have been physical findings if there in fact had been sexual penetration especially with a penis." (*Id.* at ¶ 7).  Dr. Fitzgerald noted, however, that "since one was not ordered, no one would be able to say there were injuries consistent or inconsistent with the allegations" of the victims. (*Id.*)  As to how counsel decided to proceed with her representation of Petitioner, she stated:

> Since there was no physical exam ordered, I did not call Dr. Deborah Fitzgerald or any other medical doctor to talk about the lack of a physical examination because there was no evidence for a doctor to explain or challenge.  I made the tactical decision to cross exam[ine] the prosecution witnesses on the lack of physical examinations and argue the points on that topic in closing arguments.

(*Id.* at ¶ 8) (erroneously marked ¶ 7).

///

///

Defense counsel subsequently argued the following to the jury during closing:

> Now, it would have been nice - - it would have been so nice if we had a medical examination. It would have been so nice if we had some kind of medical findings in this case to help shed some light on what happened.
>
> It would be nice because the medical findings - - we would not have to kind of sift through those to see if those are telling the truth or if those are lying. Those would have been concrete. [¶] Unfortunately, we don't have those. Now, when Detective Lopez was questioned, "why didn't you do any medical findings?" he kind of gave me the runaround.
>
> "Well," he said, "there's a 72-hour rule. And, you know, I don't order them if it's beyond 72 hours because I don't believe that they're going to yield significant results." [¶] Well, then why did you schedule the interview for nine days later? [¶] Why would you do that? [¶] We know that these medical examinations can be done any time at these hospitals. [¶] So then why would you wait until you believe that there may not be any physical evidence? [¶] Why? [¶] Unless you did not believe that a physical examination would yield any evidence based upon what you heard in those particular interviews and what you knew about the case.
>
> Even after Breanna had her interview, the team met - - that team included Detective Lopez and, they said, I think - - Miss Schultz said, I think, that maybe she should have a medical examination done. [¶] It could have been conducted right down the hall, right then. We could have got to the bottom of this. No medical examination at all.
>
> Now, it's funny how Detective Lopez said that there's this 72-hour rule, but then, when Miss Schultz was questioned, she said that she's seen medical examinations ordered for kids who disclose about a - - less abuse that happened days, weeks, months, even years prior. [¶] Why would anyone order a medical evaluation years after the alleged incident if they didn't think they could find anything? [¶] Why? [¶] Because they know that, if you do a medical examination, you can still find evidence that something has occurred. [¶] Detective Lopez says, "Well, I will only order them after the 72 hours if there was something that I believe happened." [¶] And you have his

testimony. You can ask for it back. [¶] He said, "I'll order it after 72 hours if I believe something happened."

But, after the interviews, even though the team said, "maybe we should have one," he never ordered one. He never ordered one, despite the fact that he said that he has done so in the past if he believed something happened.

We also found out from Miss Schultz that not only does law enforcement - - is it their responsibility to make the request for the medical examination, but she also said that the parents - - that they have a say-so in whether or not a medical examination is going to be done. Yet, no medical examination [was] done in this case.

(Resp't's Lodgment No. 2, ECF No. 8-5 at 563-65).

Petitioner avers that defense counsel's informal discussion with Dr. Fitzgerald did not amount to a consultation, as such, she failed to properly investigate a viable defense. According to Petitioner, had counsel properly investigated this defense, an expert would have presented evidence that a physical exam would have produced evidence of vaginal penetration or tearing. (Pet. at 6, 28; Obj. at 7).  In light of the deference afforded to the opinion of the California Court of Appeal, the Court agrees that defense counsel "presumably realized medical expert testimony would not be exculpatory or add measurably to [Petitioner's] defense, because with or without it, the case hinged on the credibility of the girls' testimony." (Resp't's Lodgment No. 9, ECF No. 8-13 at 2).   It is therefore not unreasonable for trial counsel to make a tactical decision to tailor her defense to avoid presenting duplicative testimony of the same conclusion that she adduced from Sergeant Lopez and Schultz: namely, that it was possible a physical examination might have detected evidence of sexual abuse. *Richter*, 562 U.S. at 109 ("To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates.").

Petitioner objects to the Report's recommendation that the failure to present a medical expert does not bear the gravitas that Petitioner urges this Court to find.  In support, Petitioner includes declarations from Dr. Steven Gabaeff, a physician specializing in child

abuse cases, Robert Boyce, Esq., a criminal defense attorney with experience in child abuse cases, and current counsel, Patrick Ford, Esq., who represented him during the state habeas proceedings, and the instant matter.

The Court agrees with Judge Brooks' recommendation that the declarations are not probative of trial counsel's unreasonableness in her trial strategy. As discussed in the Report, trial counsel's actions do not suggest a failure to investigate, as suggested by the declarations of Boyce and Ford. Despite Petitioner's characterization to the contrary, counsel consulted with Dr. Fitzgerald by phone. The declarations submitted by both defense counsel and Ford represent that Dr. Fitzgerald informed defense counsel that there would be signs of scarring or tearing indicative of penetration if a physical examination occurred. (Oliver Decl. at ¶ 7; Ford Decl. ECF No. 8-10, Ex. D at ¶ 8). While Dr. Fitzgerald also told defense counsel she would not testify as an expert witness, this consultation served as a foundational basis for the cross examination of Detective Lopez and Schultz as to the decision not to order a physical examination, and Lopez's improper procedure in not ordering an examination. Despite his objection, Petitioner does not cite to any case law or provide any persuasive reason as to why this phone call should not be characterized as a consultation.[7] The Court agrees with Judge Brooks that in light of the consultation with Dr. Fitzgerald, and the retention of Dr. Eisen, a child psychologist, defense counsel's performance was not unreasonable.[8] (R&R at 35).

Further, Petitioner's reliance on *Weeden v. Johnson*, is unpersuasive as *Weeden* is

_____

[7]   Petitioner states only that the phone call was brief, and occurred "while Dr. Fitzgerald was in her car and immediately told counsel that she no long[er] [sic] did that work, although it sounded like a viable course to pursue." (Obj. at 5-6). However the only reference to speaking to an expert in a car occurred during the hearing on a motion for a new trial where counsel stated she "received a phone call back from Dr. Eisen. And I remember this vividly because I wasn't in my office. I was in my car[.]" (Resp't's Lodgment No. 2, ECF No. 8-6 at 67).

[8]   During the hearing on the motion for a new trial, defense counsel testified that she retained Dr. Eisen, a board-certified licensed psychologist, to testify as to suggestibility. Dr. Eisen ultimately was not called to testify as a defense witness.

distinguishable.  The Ninth Circuit in *Weeden* found a claim of ineffective assistance of counsel was supported where trial counsel failed to investigate psychological testimony before forming a trial strategy.  *Weeden*, 854 F.3d 1063 (9th Cir. 2017).  "The correct inquiry is not whether psychological evidence would have supported a preconceived trial strategy, but whether [trial] counsel had a duty to investigate such evidence in order to form a trial strategy, considering 'all the circumstances.' " *Id.* at 1070 (quoting *Strickland*, 466 U.S. at 691)).  Here, unlike *Weeden*, trial counsel's consult with Dr. Fitzgerald constituted an investigation of a defense theory.  As determined by the California Appellate Court, trial counsel instead made the tactical decision based upon the belief that "medical expert testimony would not be exculpatory or add measurably to Ross's defense, because with or without it, the case hinged on the credibility of the girls' testimony." (Resp't's Lodgment No. 9, ECF No. 8-13 at 2).

Ross' state habeas appeal also included the declaration of experienced trial counsel Robert Boyce, who contends that trial counsel's choice "not to call a medical doctor was not a reasonable tactical decision," (Boyce Decl., ECF No. 9-3, Ex. C at ¶ 8), and "[r]easonably competent counsel in the present situation would have presented a medical expert to explain to the jury that a medical exam would likely have shown whether the girls' allegations of penetration were true or false." (*Id.* at ¶ 9).  However, the Boyce declaration is similarly unpersuasive as there are "countless ways to provide effective assistance in any given case." *Richter*, 562 U.S. 106 (internal quotation omitted).

The Court is similarly unpersuaded with Boyce's assertion that Ross would be entitled to a jury instruction based upon "the state's failure to collect or preserve important evidence [which] may, by itself, be sufficient to establish reasonable doubt and the jury may be instructed on that point." (Boyce Decl. at ¶ 8).  As noted by the Report, this instruction may be appropriate where there is willful destruction or a failure to preserve evidence.  (R&R at 36 (citing *People v. Wimberly*, 5 Cal. App. 4th 773, 793 (1992)).  However, the *Wimberly* court does not establish that an adverse inference instruction is required, rather, it discussed the appropriate sanctions for destruction of evidence in

violation of a court's discovery order. *Wimberly*, 5 Cal. App. 4th at 778 (finding sanction appropriate where an instruction informed the jury that police destroyed evidence in violation of a court order, described the destroyed items, and informed the jury that they may draw an adverse inference to the prosecution."). It appears that Boyce is drawing a false equivalency between the willful destruction and the failure to preserve evidence, with the failure to collect evidence. To the extent that Boyce asserts that a failure to collect potentially exculpatory evidence may entitle Ross to an adverse inference instruction, that argument is unavailing, as there is no evidence there was bad faith, and it is not deficient performance to request an inapplicable instruction. *See Arizona v. Youngblood*, 488 U.S. 51, 56-57 fn. * (1988) ("The presence or absence of bad faith by the police ... must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."); *see also Miller v. Vasquez*, 868 F.2d 1116 (9th Cir. 1989) (holding that a bad faith failure to collect potentially exculpatory evidence violates the due process clause); *see also Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (holding that "the failure to take a futile action can never be deficient performance").

Petitioner also relies on a number of cases finding ineffective assistance of counsel where counsel fails to investigate and present expert testimony. However, as noted by the appellate court, each case cited by Petitioner in support of finding unreasonable performance based on counsel's failure to adduce medical evidence is distinguishable. The courts in the cited cases found ineffective assistance of counsel where defense counsel failed to call a medical expert where the prosecution had adduced medical expert testimony as to sexual abuse. *See In re Hill*, 198 Cal. App. 4th 1008, 1024 (2011) (finding ineffective assistance of counsel after counsel "admit[ted] she had no tactical reason not to request and obtain the colposcopic photographs taken during [the victims'] forensic examination …."); *see also Gersten v. Senkowski*, 426 F.3d 588, 608 (2d. Cir. 2005) (finding ineffective assistance after defense counsel conceded medical evidence central to the prosecution's case "without any investigation into whether it could be challenged[.]"); *Michael T. v. Comm'r of Corr.*, 122 Conn. App. 416, 425 (2010) ("[T]rial counsel was ineffective in

failing to present expert testimony to challenge the state's expert medical testimony that strongly linked the child's trichomonas to sexual assault."). Here, there was no medical theory to rebut, thus, "[t]he most a medical expert could testify to is that *if* the girls' testimony was truthful, examinations *likely* would have revealed injury (Resp't's Lodgment No. 9, ECF No. 8-13 at 2 (emphasis in original)). In fact, Petitioner himself concedes that "[w]e don't know for sure whether the evidence produced by the medical exam would have exonerated petitioner." (Pet. at 33).

Based on the foregoing assessment of defense counsel's overall performance throughout the case, Petitioner has not overcome the " 'strong presumption' that counsel's representation was [not] within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689); *Strickland*, 466 U.S. at 690 ("[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgement."). Similarly, given the reasonableness of counsel's performance, the Court also finds the state court's determination that defense counsel was not deficient in failing to present expert testimony is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See Richter*, 562 U.S. at 106 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.").

### b.   *Prejudice*

Even assuming Ross prevailed in showing his counsel's performance was objectively unreasonable, he fails to demonstrate that "[t]he likelihood of a different result [is] substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693).

In rejecting Petitioner's argument of prejudice, the appellate court found that defense counsel elicited testimony that highlighted the recommendation of a physical exam for one

victim, but not the other.  (Resp't's Lodgment No. 9, ECF No. 8-13 at 3).  According to the court, this "would not have been recommended unless it was possible for injury to be detected long after it was inflicted[.]"  (*Id.*)  Petitioner refutes this finding and corollary recommendation in the Report, arguing that "[i]t is one thing to point to weaknesses in the accusers' statements … but it is far more powerful (and necessary) to prove the lies with medical evidence, evidence the police were supposed to have collected but choose [sic] not to."  (Obj. at 8).

In accord with the Report, the Court finds that Petitioner's argument is unpersuasive in light of the trial testimony and trial counsel's statements.  The appellate court reasonably concluded Petitioner failed to establish prejudice where both victims provided extensive testimony recalling the events of abuse.  (Resp't's Lodgment No. 2, ECF No. 8-4 at 114-233).  Breanna testified, *inter alia*, that Ross touched her "private parts" with his hands and mouth, (*id.* at 123), on multiple occasions, (*id.* at 125).  Breanna further testified that Ross touched her with a "buzzy toy," (*id.* at 132), that had a "medium, fast, and like, low" setting (*id.* at 133), "inside of her privates," (*id.* at 132).  Breanna's testimony continued with allegations of Ross "pee[ing on her], in [her] private part, the one below the stomach," (*id.* at 137).  Hannah testified, *inter alia*, that Ross touched her in her vagina, (*id.* at 197), her chest, (*id.* at 198), and her "butt," (*id.* at 199).  Hannah further testified that Ross touched the inside, (*id.* at 207), of her "bikini area" with his hands, (*id.* at 206).

Defense counsel portrayed the girls' trial testimony as equivocal or inconsistent, as highlighted by Schultz, who testified as to the dangers of "suggestibility."[9]  On cross-examination by defense counsel,  Detective Lopez testified it was possible that a physical examination might have detected evidence of sexual abuse.  (Resp't's Lodgment No. 2, ECF No. 8-4 at 319-22).  During closing arguments, trial counsel emphasized the

---

[9]    "Suggestibility," as Ms. Schultz describes it, is "when you are talking to a child, and you are … potentially providing the information [asked in the question] to the child." (Resp't's Lodgment No. 2, ECF No. 8-5 at 369).  The dangers of suggestibility "would be that a child gives inaccurate information." (*Id.* at 370).

inconsistency and irregularity in Detective Lopez's actions during the investigation and his circular reasoning for not ordering a physical examination.  (*Id.* at 563-65).  As noted by Judge Brooks, trial counsel focused on these discrepancies and the lack of medical evidence to argue there was insufficient evidence to support the charges. (*Id.*)  As such, it was not unreasonable for the appellate court to conclude the outcome of the trial would not have been different had defense counsel called an expert. (*See* Resp't's Lodgment No. 2, ECF No. 8-5 at 362, 369-372).  As Respondent notes, and a fact to which Petitioner agrees, "[w]ithout the benefit of expert medical testimony, the People's case relied solely on the credibility of the victims."  (Answer at 9; Obj. at 8 ("The state's entire case rested on the credibility of the accusers that was effectively challenged in a number of ways.")).

The Court agrees with Judge Brooks' recommendation that trial counsel took advantage of the lack of physical examinations to highlight that a physical examination would obviate the need to rely solely on the testimony of the victims. (R&R at 38).  The Court further agrees that the testimony of a child abuse expert would not have significantly changed the outcome.  Even if Petitioner proffered testimony at trial from an expert who would have testified that injury would be present for years after sexual abuse, it merely highlights a deficiency in the investigation already highlighted by Ross' trial counsel. Importantly, defense counsel's trial strategy was effective.  The jury weighed the victims' credibility against the testimony at trial; a fact supported by the jury's finding of not guilty as to certain charged conduct related to the penetration or attempted penetration of the victims with Ross' penis (counts one, eight, nine, seventeen, and eighteen).  (Resp't's Lodgment No. 1, ECF No. 8-2 at 159-79).[10]

---

[10]      Petitioner also alleges that the Report is deficient for failing to include evidence of Petitioner's innocence or mention the weaknesses apparent in this case.  (Obj. at 7-8). However, the Report does in fact note that "[t]he allegations of penetration by the girls were weak[.]" (R&R at 38). Similarly, the Report relies, in part, on trial counsel's challenges to the prosecution's case, including "that the children were susceptible to manipulation by their parents," in the Report's analysis of prejudice. (R&R at 38). Thus,

Based on the foregoing analysis, the Court finds the Court of Appeal opinion is not contrary to clearly established Supreme Court law and does not involve an unreasonable application of clearly established Supreme Court law. Nor is the state court adjudication of Petitioner's claim of ineffective assistance of counsel based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

In light of the appellate court's reasoned decision and the content of the original writ, the Court finds that the fact-finding process was not deficient, and the appropriate standard of review is deference under AEDPA. Accordingly, Petitioner is subject to the doubly deferential standard as set forth in *Strickland*, and is therefore not entitled to habeas relief pursuant to § 2254.

## D.   Certificate of Appealability

Rule 11 of the Rules following 28 U.S.C. § 2254 require the District Court to "issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant." Rule 11, 28 U.S.C. foll. § 2254. A COA will issue when the petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005). To meet this threshold showing, Petitioner must show: (1) the issues are debatable among jurists of reason, (2) a court could resolve the issues in a different manner, or (3) the questions are adequate to deserve encouragement to proceed further. *Lambright v. Stewart*, 220 F.3d 1022, 1024–25 (9th Cir. 2000) (citing *Slack v. McDaniel*, 529 U.S. 473 (2000)). Here, the Court concludes that reasonable jurists could not find the constitutional claims debatable, and therefore a certificate of appealability is **DENIED**.

///

///

///

---

a close examination of the Report evinces that Petitioner's arguments in this regard are unsupported and contradicted.

## VI.   CONCLUSION

For all the foregoing reasons, **IT IS HEREBY ORDERED** the Court:

1.   **OVERRULES** Petitioner's objections to the Magistrate Judge's report and recommendation;

2.   **ADOPTS** the Magistrate Judge's report and recommendation;

3.   **DENIES** the Petition in its entirety; and

4.   **DENIES** a certificate of appealability.

**IT IS SO ORDERED.**

Dated: August 16, 2023

_____
JOHN A. HOUSTON
UNITED STATES DISTRICT JUDGE

3:17-cv-00953-JAH-BLM